[No. 14636-0-I.   Division One.   April 29, 1985.]

THE STATE OF WASHINGTON, *Respondent,* v. JAMES
DORSEY, *Appellant.*

*Edwards & Barbieri* and *Charles K. Wiggins,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Margery Hite, Deputy,* for respondent.

GROSSE, J.—Defendant James Dorsey appeals his conviction on multiple counts of first degree theft. His principal allegation on appeal is that there was a lack of probable cause for his arrest such that critical evidence seized in the course of that arrest should have been suppressed. We affirm.

At the request of the Kirkland Police Department, the defendant was arrested at the airport in Burbank, California, by an officer of the Burbank Police Department. The arrest occurred shortly after 6 p.m. on January 20, 1983, within minutes of the arrival of PSA flight 76 from Seattle via Reno, Nevada. Defendant's arrest resulted from the belief of the Kirkland Police Department that he was an accomplice to a series of thefts from a number of banks in the Kirkland area which thefts were in the form of cash

advances on counterfeit Visa cards. The investigation of this matter was triggered by the initial observations and suspicions of a teller at Peoples Bank, Totem Lake Branch, who handled one of the early transactions.

At the time the Kirkland Police Department requested the Burbank police to arrest the defendant and his three companions, they were in possession of the following array of facts. In just a few hours on the morning of January 20, 1983, six banks in the Kirkland area were approached for cash advances on counterfeit Visa cards. The counterfeit cards used were in the names of Carmen Levine, Patricia Ferro, Jeanine Grossman, and Aida Grey. Each of those names were those of the true account holders. Over $8,000 was obtained from these six banks by use of the counterfeit cards. In each case, the cash advance was sought by one of two women.

The police also had detailed descriptions of the two women and the car in which they were being driven by two black men. These details were obtained from the bank tellers who handled the transactions. A check of the vehicle's license plate number disclosed that it was rented to a Patricia Shaw using yet another counterfeit Visa card.

The Kirkland police transmitted this information to the Port of Seattle police which in turn distributed it to all airline counter personnel by means of a bulletin. Shortly after distribution of the bulletin, an agent for PSA airlines notified Port police that a woman using the name of Patricia Shaw, and using a Visa card in that name, had purchased four tickets on PSA flight 76 to Reno and Burbank. The agent further stated that he was sure that these tickets were for the four people referred to in the bulletin. He gave police the seat numbers assigned to the four tickets. PSA also informed the police that the four people occupying the seats purchased by Patricia Shaw continued to occupy them during the layover in Reno and that they had an infant with them as well.

In the course of several telephone conversations, Kirkland relayed this information to the Burbank police.

Kirkland informed Burbank that there was "probable cause" and requested that they arrest the four suspects for first degree theft if they could be located coming off the plane in Burbank. Kirkland feared the circumstances were such that unless the suspects could be detained they would simply disappear and there would be no future possibility of locating them. Sergeant Kight of the Burbank Police Department was provided with the gist of the information that had been relayed to Burbank and directed to make an arrest.

Sergeant Kight arrived at the Burbank airport at 5 or 6 minutes after 6 p.m., just as PSA flight 76 was disembarking. When he arrived at the gate designated for arrivals from the PSA flight, he observed the four suspects walking from the plane through the doors into the terminal itself. The sergeant was able to identify the women from the descriptions he had been given and the black men from the fact that they were walking together with the two women, appeared to be talking together, and that one of the men, who later was identified as Mr. Dorsey, was carrying an infant.[1]

---

[1]Sergeant Kight's testimony was as follows:

"Q Were you able to determine where flight 76 was disembarking?

"A Yes.

"Q How did you do that?

"A When I walked in the front door of the airport, they have those TV computers, and it states up there what planes are arriving and departing, and I looked for flight 76, PSA, because as you walk in, that is the PSA terminal area.

"Q Did you go to the gate?

"A Yes, I did.

"Q The gate indicated on that monitor, and did you identify the suspects?

"A Yes.

"Q How were you able to identify them?

"A As I arrived, the one lady was wearing the fur coat which was rather distinctive. It was like it had white sleeves and then a four or five inch strip of tawny colored fur and then white and tawny on across, and they were walking—the girls were walking with the two black males. The black—the defendant here, Mr. Dorsey was carrying an infant, and they were all walking together side by side coming off the airplane, not coming off the airplane, coming through the entrance doors from the airplane.

"Q Did they appear to be talking together?

Immediately upon identifying the suspects the sergeant informed them that he was a police officer and that they were being detained for the State of Washington. As he said this, he held out his arms and directed the suspects to an area in the terminal where other officers were waiting to assist in the arrests. The suspects were not handcuffed or restrained in any way at this point in the encounter. Sergeant Kight further testified to the following sequence of events:

Q While they were walking towards that area that you had directed them to, did you observe the defendant do anything?

A Yes. Very shortly I was joined by the other officers and they took charge of the two females, and a person later identified to me as Mr. Lewis, and I took charge of Mr. Dorsey who was carrying the infant, and I was walking directly to his rear left, and as we were walking out to the car, which is probably 50 feet from—70 feet from the gate where they entered the terminal, I noted that Mr. Dorsey appeared to be patting the infant's diaper, and then I noticed that he wasn't patting the diaper but he was shaking his coat. He was wearing a coat similar to the one he has on in court today, and he was shaking his coat, and I could see a white envelope protruding out the pocket, out the left pocket, and at that time I formed the opinion he was trying to get rid of that envelope, because he was shaking the jacket and not trying to comfort the baby as I had first thought he might be doing.

So, I seized the envelope, and it was opened, and I could see inside of it several credit cards and other forms of identification.

The envelope contained several credit cards and other forms of identification, among which were the credit cards and identification used to accomplish the thefts in Kirkland, obtain the rental vehicle, and to purchase the four PSA airline tickets.

---

"A Yes.

"Q Did the other female that you observed match the description you had been given?

"A Yes."

Mr. Dorsey was taken before a California magistrate for a preliminary hearing on the lawfulness of his arrest and subsequent search. The California court found there were not sufficient articulable facts on which to base the arrest, held it unlawful, and suppressed the envelope and its contents.

## I

Prior to trial in Washington on charges of theft, defendant asserted that Washington courts are collaterally estopped from reconsidering the issues considered at the California hearing and are bound by the ruling of the California court finding no probable cause for the arrest and suppressing the evidence seized in the course of that arrest. He renews that assertion here.

■ Collateral estoppel bars relitigation between the same parties on an issue of ultimate fact that has been determined by a valid and final judgment. *Ashe v. Swenson*, 397 U.S. 436, 443, 25 L. Ed. 2d 469, 90 S. Ct. 1189 (1970). The doctrine has been incorporated into the Fifth Amendment's protection against double jeopardy in criminal cases. *Ashe*, at 445. *See also State v. Dupard*, 93 Wn.2d 268, 609 P.2d 961 (1980).

Defendant's assertion of the doctrine raises two questions: First, whether the result of a suppression hearing is a valid and final judgment. Second, whether there is sufficient identity of parties between the State of California and the State of Washington.[2] Because we answer the first question in the negative, we need not now consider the second.

The requirement of a valid and final judgment lies at the heart of the doctrine. Collateral estoppel is intended to prevent relitigation of already *determined* causes. A valid

---

[2] "As to identity of parties, mutuality of parties is not a limiting ingredient of the collateral estoppel rule imposed by the Fifth and Fourteenth Amendments. It is sufficient that the party *against whom* the plea of collateral estoppel is asserted was a party or in privity with a party in the prior litigation." *State v. Dupard*, 93 Wn.2d 268, 273, 609 P.2d 961 (1980).

and final judgment is necessary to permit the requisite inquiry in any subsequent proceeding to ascertain whether or not the prior action necessarily determined an ultimate fact or issue in the subsequent prosecution. *See State v. Harris,* 78 Wn.2d 894, 480 P.2d 484, *rev'd on other grounds,* 404 U.S. 55, 30 L. Ed. 2d 212, 92 S. Ct. 183 (1971). *See also State v. McMains,* 7 Wn. App. 75, 497 P.2d 962 (1972). The reviewing court must have before it a "reasoned opinion" of the earlier court so as to determine not only whether the earlier litigation was complete but whether the facts or issues which are sought to be precluded from relitigation have in fact been determined. *See United States ex rel. DiGiangiemo v. Regan,* 528 F.2d 1262 (2d Cir. 1975).

Here, even assuming the doctrine was otherwise applicable,[3] we do not have a ruling by the California magistrate which would permit an adequate review of the basis for his ruling and of the facts and issues ultimately determined. Moreover, in the instant matter, the California suppression hearing occurred pursuant to section 1538.5 of the California Penal Code. Subsection (j) of that section specifically provides that where evidence has been suppressed at a preliminary hearing, as in the instant matter, and the defendant is not there held to answer, the people may file a new complaint or seek an indictment after the preliminary hearing; and the ruling at the preliminary hearing is not to be considered binding in any subsequent proceeding. The California suppression hearing ruling was not a final judgment, so collateral estoppel may not be applied.

---

[3]The District of Columbia Circuit Court of Appeals has specifically held the doctrine of collateral estoppel inapplicable to the results of a suppression hearing since under proper circumstances either the defendant or the prosecutor may obtain a de novo reexamination of the suppression hearing ruling by the trial court, and the ruling is thus not a final judgment. *McRae v. United States,* 420 F.2d 1283, 1286 & n.2 (D.C. Cir. 1969). Washington court rules and cases also recognize that its suppression hearing rulings are not final judgments, RAP 2.2(b); *State v. McKenzie,* 12 Wn. App. 88, 89, 528 P.2d 269 (1974), but are interlocutory orders, *State v. Whitney,* 69 Wn.2d 256, 260, 418 P.2d 143 (1966).

## II

Defendant Dorsey next contends that the facts surrounding his arrest amount to no more than a showing of his merely being present with, or associating with, others suspected of criminal activity; that even assuming probable cause to arrest the others, the police were not entitled to arrest him under the "mere presence doctrine."

■ The "mere presence doctrine" was recently rearticulated in *State v. Broadnax*, 98 Wn.2d 289, 654 P.2d 96 (1982). Our Supreme Court applied the principles of *Ybarra v. Illinois*, 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979) to the search of an individual present at a residence being searched for narcotics pursuant to a warrant. The court refused to permit the search and stated:

A person's mere presence at the scene of suspected criminal activity does not entitle police officers to search that individual. Neither may the police seize an individual, other than an occupant of the premises, so as to make him available in case probable cause is later developed to arrest him. As described by one court:

The "mere presence" doctrine seeks to protect persons innocently in the company of a known or suspected criminal. *Therefore, some additional circumstance from which it is reasonable to infer knowledge of or participation in criminal enterprise must be shown.*

(Italics ours.) *United States v. Vilhotti*, 323 F. Supp. 425, 432 (S.D.N.Y. 1971). Any other conclusion would contravene the protections of the Fourth Amendment and Const. art. 1, § 7.

*Broadnax*, at 302.

Both *Broadnax* and *Ybarra* rely on the signal case with respect to "mere presence" as it relates to probable cause to arrest, *United States v. Vilhotti*, 323 F. Supp. 425 (S.D.N.Y. 1971). *Vilhotti* involved three defendants arrested without a warrant at a garage containing a quantity of hijacked cigarettes. The arresting officer had been advised by a reliable informant that defendant Vilhotti used the garage as a drop for stolen goods and that Vilhotti had been a participant in the hijacking of two trucks. The

agent observed three men enter the garage. He recognized one as defendant Vilhotti and one as a dismissed police officer not specifically implicated in the hijacking by the informant. The third man he did not recognize. Despite his lack of prior information connecting the two individuals other than Vilhotti to the crime he was investigating, the agent arrested all three people in the garage. In upholding the arrests, the District Court held that these facts presented the necessary additional circumstances from which it was reasonable to infer knowledge and participation in the criminal enterprise on the part of the two previously unimplicated individuals. In addition, the District Court held that it is not necessary to probable cause that an officer know the identity of a suspect.[4]

Also relying on *Vilhotti,* the Ninth Circuit recently considered the "mere presence" doctrine in *United States v. Hillison,* 733 F.2d 692 (9th Cir. 1984). There, the appellant was observed for 2 days in the company of two other individuals as to whom there was probable cause to believe were engaged in distributing cocaine. The court scrutinized the arrest as follows:

> In order to find probable cause based on association with persons engaging in criminal activity, some additional circumstances from which it is reasonable to infer participation in criminal enterprise must be shown. One important consideration in assessing the significance of the association is whether the known criminal activity was contemporaneous with the association. Another is

---

[4]*United States v. Vilhotti,* 323 F. Supp. 425, 432 (S.D.N.Y. 1971). In *United States v. Llanes,* 398 F.2d 880, 883 (2d Cir. 1968), the court stated:
> In order for an agent to have probable cause to arrest he need not know the identity of the person being arrested. He need only know enough to support a prudent man's belief that an offense is being committed by the person, known or unknown, whom he is arresting.

*See also State v. Ward,* 24 Wn. App. 761, 603 P.2d 857 (1979), *cert. denied,* 449 U.S. 984 (1980), sustaining the warrantless arrest of an unidentified black male whom an eyewitness had stated was one of three who had previously robbed him and was in his store, despite the fact that when police encountered the man he was one of three black males on the premises and was distinguished only by his evasive answers to police questions.

whether the nature of the criminal activity is such that it could not normally be carried on without the knowledge of all persons present.

(Citations omitted.) *Hillison,* at 697 (finding probable cause based on association and the circumstances).

At the moment of defendant Dorsey's arrest, the collective knowledge of the police with respect to him can be summarized as follows: (1) two unidentified black men were observed in the automobile used by two specifically described females to accomplish the thefts; (2) the actions of the driver of the automobile (one of the black men) in operating the car during the succession of thefts were such that knowledge of the enterprise could be inferred; (3) the same auto had been rented from Avis with a counterfeit credit card used in the thefts and was returned to Avis at Seattle–Tacoma airport; (4) the same counterfeit credit card used to rent the car was used by one of the identified females to purchase four tickets to Burbank on PSA flight 76 and to receive four seat assignments; (5) four people and an infant boarded and occupied the assigned seats, two females and two black men; (6) four people and an infant, two unidentified black males and the two identified females, were observed at Burbank coming through the gate in a group from flight 76 under circumstances making it highly unlikely that they were other than passengers or other than together; (7) all of these events occurred within an 8– to 10–hour period on January 20, 1983.

■ There is more here than mere propinquity. The test, after all, remains probable cause. Regardless of the articulation of specific doctrines to encompass factual circumstances that might not constitute it,

[p]robable cause exists where the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in a belief that an offense has been or is being committed.

*State v. Gluck,* 83 Wn.2d 424, 426–27, 518 P.2d 703 (1974). Probable cause is not a technical inquiry. In any given case

it is a set of factual circumstances and practical considerations governing the actions of reasonable and prudent people in their normal, everyday affairs. *See Gerstein v. Pugh,* 420 U.S. 103, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975). Against this ultimate test the criteria set forth in *United States v. Vilhotti, supra,* and *United States v. Hillison, supra,* are satisfied. We hold that these facts give rise to an inference that the defendant Dorsey was one of the two black men involved in the scheme of thefts that had occurred that day in the Kirkland area. The credit card thefts were contemporaneous with the defendants' association, and the means and manner of the thefts were such that all those present had to have known of the scheme if not participating in it. There was probable cause for the actions of the police at the Burbank airport.

We believe the trial court's decision to admit the evidence seized from Mr. Dorsey can also be sustained on additional grounds.[5] A recent unanimous decision of the United States Supreme Court is apposite. *United States v. Hensley,* __ U.S. __, 83 L. Ed. 2d 604, 105 S. Ct. 675 (1985).

*Hensley* involved a wanted flyer distributed by one Cincinnati suburban police department to other police departments in the Cincinnati metropolitan area stating that Hensley was wanted for investigation of an aggravated robbery. The flyer contained a description of Hensley, the date and location of the alleged robbery, and asked other departments to pick up and hold the suspect if he were located. Approximately 1 week later an officer from a second suburban police department stopped Hensley in his car relying on the information in the flyer and his belief that a warrant was outstanding. His radio dispatcher was checking on the warrant while he stopped Hensley. As he had Hensley and his passenger step out of the car, a second officer

---

[5]As set forth in *State v. Carroll,* 81 Wn.2d 95, 101, 500 P.2d 115 (1972):

"If the judgment of the trial court can be sustained upon any ground, whether the grounds stated by the trial court or not, it is our duty to affirm."

who arrived on the scene recognized the passenger as a convicted felon and observed the butt of a revolver protruding from underneath the passenger's seat. The passenger was then arrested. A search of the car turned up a second handgun in a jacket in the front seat and a third in a bag in the backseat. Hensley was then arrested. At trial, Hensley moved to suppress the handguns on the grounds that the stop violated the Fourth Amendment and was outside the permissible scope of a *Terry*[6] stop. The Sixth Circuit reversed his conviction on those grounds.

■ The Supreme Court first decided that the principle and rule of *Terry* extends to a stop or seizure of a person suspected of involvement in a completed crime. Second, the Court held that the same interests that weighed in favor of its extending *Terry* to stops for investigation of past crimes supported "permitting police in other jurisdictions to rely on flyers or bulletins in making stops to investigate past crimes." *Hensley,* 105 S. Ct. at 682. Specifically, the Court stated:

> Assuming the police make a *Terry* stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop, and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department.

(Citation omitted.) *Hensley,* 105 S. Ct. at 683.

In short, the Court held that reliance on requests and information from other police agencies is justified so long as the actions taken in reliance do not go beyond that permitted by an objective analysis of the facts and information provided. The *Hensley* rationale is dispositive of the instant matter.

We will assume that the Kirkland police did not have probable cause for the arrest of either of the two unidentified black men and that the information they transmitted

---

[6]*Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

to the Burbank police, when objectively analyzed, gave rise to no greater inference. However, Kirkland unquestionably had reasonable grounds for the suspicion that the two black men in the company of the two specifically described women were involved with those women in the commission of the Totem Lake thefts. This was sufficient to justify an investigatory stop of the two black men.

While the Kirkland police did tell the Burbank police that there was probable cause and did request the arrest of all four suspects, an analysis of the events at Burbank, up to the point of discovery of the Peoples Bank envelope, demonstrates that what occurred was no more lengthy nor intrusive a stop and detention than would have been permitted the Kirkland police had they encountered these four suspects.[7]

The Burbank officer who first encountered the suspects identified himself and stated that the four were being detained for Kirkland, Washington, police. At the same time, by holding out his arms, he directed them out of the stream of passengers toward a group of additional officers. As the suspects moved toward these other officers, Sergeant Kight observed defendant Dorsey shaking his jacket and, on closer scrutiny, observed an envelope sticking 1 to 2 inches out of his jacket pocket. Under these circumstances, the sergeant was justified in his suspicion that the defendant was attempting to get rid of the envelope which might be or contain evidence, and thus justified in seizing it.

The folded envelope bore the imprint of Peoples Bank, Bellevue, Washington, and was unsealed. Sergeant Kight testified that when he took the envelope from defendant

---

[7]Sergeant Kight's actions meet the criteria of a *Terry* stop as most recently rearticulated in *State v. Samsel*, 39 Wn. App. 564, 694 P.2d 670 (1985). The *Samsel* court recognized that not every stop where the detained person is not free to move constitutes an arrest. *Samsel*, at 569–70. These may be proper investigative steps under *Terry*, depending on the circumstances, including the duration of the stop. *Samsel*, at 572. The ultimate criterion is that the stop be reasonable under the circumstances. *Samsel*, at 571. *See also United States v. Hensley*, ___ U.S. ___, 83 L. Ed. 2d 604, 105 S. Ct. 675, 684 (1985), where the initial investigative stop ripened into probable cause for arrest, as was the case here.

Dorsey he could feel that it contained credit cards. At this point there was probable cause for defendant's arrest.

## III

The defendant argues that once seized the envelope and its contents could not be examined without a search warrant. He does not argue the impropriety of the seizure of the envelope, apparently conceding that if defendant Dorsey's initial detention was an arrest based upon probable cause, then the officer's seizure of the envelope in view of the defendant's attempts to rid himself of it was appropriate. Because of our alternative *Terry* analysis of the propriety of the defendant's detention at Burbank, some discussion of the propriety of the seizure is required.

Pursuant to a lawful arrest, a law enforcement officer may search the person arrested and the area within his immediate control to the extent necessary to remove any weapons and to avoid destruction of evidence.[8] We must focus on the extent to which this same principle applies in the course of a *Terry* stop. Insofar as a limited search or "frisk" for weapons is concerned, it unquestionably does. We hold that under the circumstances of this case where the actions of the person detained give rise to a reasonable suspicion by the police that the person is attempting to destroy or rid himself of evidence, seizure of that evidence is permissible.

Recently, in *United States v. Place,* 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983), the United States Supreme Court recognized that the same interests that justify a limited intrusion of a person's privacy interests where the police have a reasonable suspicion that the person is or has been engaged in criminal activity (*Terry*) apply in some circumstances to permit an intrusion on a person's possessory interests in property.

*Place* involved a seizure of luggage from a passenger in an airline terminal for purposes of subjecting the luggage to

---

[8]*State v. Ringer,* 100 Wn.2d 686, 699, 674 P.2d 1240 (1983).

a "sniff test" by a narcotics detection dog. The agents did not have probable cause to arrest but had a reasonable suspicion that the passenger was a drug courier and that his luggage contained narcotics. The Court concluded that "the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope." *Place,* 462 U.S. at 706. The Court held that such a temporary seizure of property could be no more lengthy nor intrusive than could be justified with regard to the suspect in whose possession the property was found. This rationale supports our holding here.

If, in the course of a permissible *Terry* stop, the actions of the person being detained give rise to a reasonable suspicion that they possess evidence which is in danger of being destroyed or lost, then the investigating officers may take reasonable actions consistent with the initial stop to further investigate and to protect the possible evidence. In the instant matter, the seizure of the envelope after Sergeant Kight observed the defendant attempting to rid himself of it was justified in order to permit the officer to protect the possible evidence and further investigate the nature of the object.[9] At the point of seizure, the elements of "plain view" were satisfied and no warrant for further examination of the evidence was required.

■ The plain view test for a warrantless seizure of evidence has three elements: (1) the intrusion leading to discovery of the evidence must be justified; (2) the discovery of the evidence must be inadvertent; and (3) it must be

---

[9]*United States v. Place,* 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983). *Accord, United States v. Sharpe,* ___ U.S. ___, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985); *United States v. Johns,* ___ U.S. ___, 83 L. Ed. 2d 890, 105 S. Ct. 881 (1985), each case permitting the investigating officers to pursue a limited warrantless investigation to determine whether they had evidence. In both cases the Court stressed that the warrantless intrusion was valid only if it went no further than the permissible limits of a *Terry* stop. Thus, while the actions of the officers in *Sharpe* and *Johns* received sanction, the Court refused to permit the 90-minute warrantless detention of luggage in *Place.*

immediately apparent to the officer that what he has before him is evidence. *State v. Lair,* 95 Wn.2d 706, 630 P.2d 427 (1981) (permitting the opening of a folded paper by the officer in the course of a lawful arrest as being in "plain view" under all the facts and circumstances).[10]

In this matter the intrusion was justified by the defendant's actions in attempting to rid himself of what Sergeant Kight reasonably thought might be evidence. The observation of the envelope itself was inadvertent. As soon as Sergeant Kight took the envelope, it was immediately apparent to him that both it and its contents were evidence for he was aware that the basis for the request that the suspects be detained was a reasonable belief that they had engaged in thefts by means of counterfeit credit cards and that one of the thefts had occurred at Peoples Bank. The envelope bore the clear imprint of Peoples Bank, Bellevue, Washington, and by sense of touch the sergeant could tell that the envelope contained credit cards. His further act of looking into the envelope to confirm his knowledge was justified.

To underscore his argument that a warrant was necessary for examination of the contents of the envelope once seized, the defendant cites *United States v. Chadwick,* 433 U.S. 1, 53 L. Ed. 2d 538, 97 S. Ct. 2476 (1976) and *United States v. Ross,* 456 U.S. 798, 72 L. Ed. 2d 572, 102 S. Ct. 2157 (1982). The defendant's reliance on these cases is misplaced. As they pertain to containers, neither *Chadwick* nor *Ross* nor the cases cited therein in support of their holdings involve the plain view exception. The issue in these cases was the scope of the exigency surrounding a warrantless probable cause arrest or seizure. *Chadwick* involved a warrantless search by the police of a suitcase placed in an automobile lawfully stopped on the street. The *Chadwick* Court refused to extend the rationale of the "automobile exception" to permit a warrantless search of any movable container placed in an automobile, holding that probable

---

[10]*See also State v. Chrisman,* 100 Wn.2d 814, 676 P.2d 419 (1984) as to the continued vitality of the plain view exception.

cause to believe the suitcase contained contraband justified only a seizure of the suitcase, not a search of its contents. In *Robbins v. California,* 453 U.S. 420, 69 L. Ed. 2d 744, 101 S. Ct. 2841 (1980), discussed in *United States v. Ross, supra,* the Court had refused to permit a warrantless search of the contents of packages found within a lawfully stopped vehicle holding that all containers are protected by the Fourth Amendment unless their contents are *in plain view.* In *Ross,* the United States Supreme Court substantially undercut the holdings of those two cases as they pertain to warrantless searches of automobiles subsequent to a lawful stop of that automobile. It was this extension of the automobile exception in *Ross* that our State Supreme Court has refused to follow. *See State v. Ringer,* 100 Wn.2d 686, 674 P.2d 1240 (1983). These are not "plain view" cases.[11] In the instant case, once properly seized, the envelope and its contents were in the plain view of Sergeant Kight and were admissible as evidence at the defendant's subsequent trial.

## IV

Finally, defendant contends that the court below erred in instructing the jury on accomplice liability. He contends the instruction permitted the jury to find him guilty although merely present with those actually committing a crime. We disagree.

The instruction given by the trial court was taken directly from RCW 9A.08.020 and was the approved WPIC 10.51, in full.[12]

---

[11]In *United States v. Place,* 462 U.S. 696, 77 L. Ed. 2d 110, 120 n.3, 103 S. Ct. 2637 (1983), the Court recognizes the continuing validity of *United States v. Chadwick,* 433 U.S. 1, 53 L. Ed. 2d 538, 97 S. Ct. 2476 (1976), but distinguishes a limited investigation procedure from a full search which requires probable cause. *State v. Ringer,* 100 Wn.2d 686, 674 P.2d 1240 (1983) is to the same effect.

[12]WPIC 10.51 states:

"A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

"A person is an accomplice in the commission of a crime, if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:

In *State v. Rotunno,* 95 Wn.2d 931, 631 P.2d 951 (1981), the Supreme Court considered the requisites of an accomplice instruction in the context of facts involving a party being present at the scene of a crime. In *Rotunno,* WPIC 10.51 had not been given in full; the last sentence had been omitted. This defect required reversal because the partially given WPIC 10.51 permitted a finding of accomplice liability on the basis of mere presence. *Rotunno,* at 933-34. It is the last sentence which requires the jury to find that the accused must not only be present with knowledge but also must be "ready to assist." That final sentence was given at trial in this case.

A challenge to the full instruction was considered by Division Three of the Court of Appeals in *State v. Robinson,* 35 Wn. App. 898, 671 P.2d 256 (1983). In *Robinson,* the defendant contended that WPIC 10.51 as given in full was insufficient without a modifying instruction explaining that the evidence must show the defendant *intended* by his presence to encourage the commission of the crime. In affirming the conviction the court approved the last sentence as embodying the requisite intent by its inclusion of the "ready to assist" language.[13]

The record in the instant matter contains evidence from which a jury could conclude that the defendant was not merely present but was actively assisting in the commission of the crime. The two black men in the automobile actively participated in driving the women involved from bank to bank; apparently surveyed the banks while the women were

---

"(1) solicits, commands, encourages, or requests another person to commit the crime; or

"(2) aids or agrees to aid another person in planning or committing the crime.

"The word 'aid' means all assistance whether given by words, acts, encouragement, support or presence. A person who is present at the scene and is ready to assist by his or her presence is aiding in the commission of the crime."

[13]*State v. Robinson,* 35 Wn. App. 898, 671 P.2d 256 (1983) contains suggestions for rewriting WPIC 10.51 so as to avoid further appeals and eliminate possible confusion in the future. Those suggestions are appropriate and we urge their consideration as well.

inside; moved the car away from the scene in a furtive manner while the women were in the banks; and returned to pick the women up after the thefts were completed. More importantly, defendant Dorsey was in possession of counterfeit credit cards and other identification papers used in the commission of the thefts.

The judgment and sentence is affirmed.

RINGOLD and COLEMAN, JJ., concur.

Reconsideration denied May 31, 1985.

Review denied by Supreme Court September 6, 1985.