[No. 26401-0-I.   Division One.   March 9, 1992.]

THE STATE OF WASHINGTON, *Respondent*, v. CARSHA ELEXIS PRESSLEY, *Appellant*.

592

*Suzanne Lee Elliott* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Ellen O'Neill-Stephens, Deputy,* for respondent.

AGID, J. — Carsha Elexis Pressley appeals her conviction of one count of possession of cocaine. She contends that the trial court erred in denying her motion to suppress the evidence offered against her as the product of an illegal stop and seizure. We affirm.

Pressley was charged with one count of possession of a controlled substance in violation of the Uniform Controlled Substances Act, RCW 69.50.401(d). Before trial the court heard and denied a CrR 3.6 motion to suppress the cocaine seized by the arresting officer. At issue were two questions: whether the initial stop was a valid *Terry*[1] stop and whether the subsequent seizure exceeded the scope of the investigative stop. The trial court's findings of fact are unchallenged by either party and effectively summarize the testimony:

1. Carsha Elexis Pressley was born on May 9, 1972. At the time of the hearing she is 18 years of age. Jurisdiction has been extended to May 9, 1991.

2. On December 5, 1989 at about 5:45 p.m., Seattle Police Officer Mike Korner was on routine patrol near the vicinity of 20th and Yesler in Seattle, King County, Washington.

3. That location is well-known to the police for narcotics transactions and gang activity. Officer Korner has training in the identification of narcotics, and is familiar with the packaging of narcotics and how they are hidden, sloughed and destroyed. He has been trained to watch the hands of people suspected of being engaged in narcotics transactions. Officer Korner has participated in buy/bust operations at Yesler and 20th. Citizens have also requested the police to patrol the area because of the number of narcotics transactions at that location.

4. As Officer Korner approached 20th and Yesler he saw the respondent standing next to a building beside another young female. Their hands were chest high and the respondent

---

[1]*Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

appeared to be pointing to an object in her hand or counting objects in her hand. The other female was intently looking at the objects in the respondent's hand.

5. Officer Korner thought that he was witnessing a narcotics transaction because of the location, the fact that the respondent and her companion were huddled together, and because the respondent was pointing to an object in her hand which could be a narcotic such as rock cocaine. When Officer Korner has observed drug transactions he has commonly seen the seller and buyer examine the drugs before the transaction is completed.

6. Officer Korner drove up to the respondent in his marked patrol car. The respondent looked up at him, said "Oh Shit" and immediately closed the hand that contained the objects. The respondent and her companion then separated and walked off in different directions.

7. When Officer Korner saw the respondent react to his presence, close her hand and walk away from her companion he had further reason to believe he had interrupted a narcotics transaction.

8. As Officer Korner approached the respondent he saw something yellow sticking out of the respondent's hand. The respondent put that hand in her coat pocket.

9. Officer Korner thought the respondent was trying to hide the object in her hand. In his experience he has seen people in possession of narcotics try to conceal the drugs in the tear of a coat pocket. It also occurred to Officer Korner that the respondent could be going for some type of weapon in her pocket.

10. Because the respondent could have a weapon in her pocket or be in the process of concealing or destroying evidence, Officer Korner asked the respondent to remove her hand from her pocket and asked her what was in her hand.

11. The respondent said nothing was in her hand. Officer Korner motioned to the respondent to give him what was in her hand. The respondent gave Officer Korner a clear cellophane wrapper which contained a crumpled yellow tissue.

12. Officer Korner had seen rock cocaine packaged and concealed in this fashion on prior occasions. Officer Korner squeezed the tissue to feel the objects inside and felt several hard objects that he believed to be rock cocaine. Officer Korner opened up the tissue and saw what appeared to be about twenty rocks of cocaine and cocaine powder.

13. Officer Korner arrested the respondent because he believed she was in possession of narcotics. Only a few minutes passed from the time Officer Korner got out of his patrol car to the time he opened up the tissue.

14. The respondent testified that she had just left a food market carrying a bag full of junk food in her left hand and rock cocaine in her right hand. She said that when the police officer

approached her she was eating a candy bar with her left hand and sharing it with her sister and holding the rock cocaine in her right hand. The respondent's testimony was not believable.

15. The substance found by Officer Korner was analyzed by forensic drug analyst Jeffrey Lew and found to be 2.6 grams of cocaine.

We note that the time of these events — 5:45 p.m. in December — is after dark.

Based on the findings above, the trial court concluded that, because Officer Korner stated specific articulable facts on which he based his belief that there was a substantial possibility that criminal conduct had occurred or was about to occur, the stop was proper. The trial court also concluded that the officer's request that Pressley remove her hand from her pocket and open it was reasonable both for reasons of officer safety and because there was a possibility that evidence might be concealed or destroyed.

## I

### THE *TERRY* STOP

We first address the question of whether there was reasonable suspicion sufficient to justify the initial investigative stop of the appellant. In the absence of probable cause to arrest, police may briefly detain and question an individual if they have " 'a well founded suspicion based on objective facts that [she] is connected to actual or potential criminal activity.' " *State v. Tarica*, 59 Wn. App. 368, 375, 798 P.2d 296 (1990) (quoting *State v. Sieler*, 95 Wn.2d 43, 46, 621 P.2d 1272 (1980)); *Terry v. Ohio*, 392 U.S. 1, 25-26, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); *State v. Glover*, 116 Wn.2d 509, 513, 806 P.2d 760 (1991). A "reasonable" or "well founded" suspicion exists if the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21; *Glover*, 116 Wn.2d at 514. The Fourth Amendment and article 1, section 7 of the Washington State Constitution require that the stop, which constitutes the seizure of a person, be reasonable. *Terry*, 392 U.S.

at 16-19; *Glover*, 116 Wn.2d at 513; *see also State v. Dorsey*, 40 Wn. App. 459, 471 n.7, 698 P.2d 1109, *review denied*, 104 Wn.2d 1010 (1985); *State v. Samsel*, 39 Wn. App. 564, 571, 694 P.2d 670 (1985) (the ultimate criterion is that the stop be reasonable under the circumstances).

In evaluating the reasonableness of an investigative stop, courts may take into account the totality of the circumstances presented to the investigating officer. *Glover*, 116 Wn.2d at 514 (citing *United States v. Cortez*, 449 U.S. 411, 418, 66 L. Ed. 2d 621, 101 S. Ct. 690 (1981)). While "the circumstances must be more consistent with criminal than innocent conduct, 'reasonableness is measured not by exactitudes, but by probabilities.' " *State v. Mercer*, 45 Wn. App. 769, 774, 727 P.2d 676 (1986) (quoting *Samsel*, 39 Wn. App. at 571). In reviewing those circumstances, courts may consider such factors as the officer's training and experience, the location of the stop, and the conduct of the person detained. *Glover*, 116 Wn.2d at 514; *Samsel*, 39 Wn. App. at 570-71 ("While an inchoate hunch is insufficient to justify a stop, circumstances which appear innocuous to the average person may appear incriminating to a police officer in light of past experience. The officer is not required to ignore that experience."); *Mercer*, 45 Wn. App. at 774. Other factors that may be considered in the context of determining whether a stop was reasonable include " 'the purpose of the stop, the amount of physical intrusion upon the suspect's liberty, and the length of time the suspect is detained.' " *Samsel*, 39 Wn. App. at 572 (quoting *State v. Williams*, 102 Wn.2d 733, 740, 689 P.2d 1065 (1984)). If the initial stop was unlawful, the evidence obtained in the course of any subsequent search is inadmissible under the exclusionary rule. *State v. Kennedy*, 107 Wn.2d 1, 4, 726 P.2d 445 (1986) (citing *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963).

■ Analysis of an investigatory stop is a 2-step process, asking (1) whether the initial detention was justified, and (2) whether the detention was reasonably related in scope to

the reason for the detention. *Tarica*, 59 Wn. App. at 375; *State v. Ortiz*, 52 Wn. App. 523, 762 P.2d 12 (1988). The scope of an investigatory stop may be enlarged if the stop itself confirms existing suspicions or arouses further suspicions. *State v. Smith*, 115 Wn.2d 775, 785, 801 P.2d 975 (1990) (quoting *State v. Guzman-Cuellar*, 47 Wn. App. 326, 332, 734 P.2d 966, *review denied*, 108 Wn.2d 1027 (1987)).

Here, the trial court correctly concluded that there were sufficient articulable facts to reasonably justify the stop. As Officer Korner indicated, his attention was initially drawn to the two girls by the manner in which they were huddling together and examining an item in Pressley's hand. This suggested to Officer Korner, based on his experience with drug transactions generally and with the area in particular, that he might be observing a narcotics transaction. While this behavior in itself was susceptible to a number of innocent explanations and insufficient to justify the stop, the manner in which the girls reacted to the officer's presence prior to the actual stop — Pressley's exclamation, "Oh Shit", and the fact that they immediately walked in different directions — was sufficiently consistent with behavior suggesting that a drug buy was taking place to justify the stop. Had their behavior after they saw Officer Korner but before he stopped Pressley not been entirely consistent with an incipient drug deal, there would not have been a sufficient basis for a valid *Terry* stop. Here, however, it was the defendant's behavior itself which supplied the additional inferences necessary to provide an articulable basis for the officer's suspicion that what he was witnessing was probably illegal activity. While the officer's basis for the stop hovers near the line between sufficient and insufficient grounds for a *Terry* stop, it did amount to more than simply an "inarticulable hunch". The officer articulated a series of observations which, when seen in the light of his experience and training, establish a well founded suspicion based on objective fact that he was observing illegal drug activity. It was therefore not unreasonable for Officer Korner to briefly

detain Pressley to investigate further. The scope of the initial detention was limited to dispelling or confirming his suspicions in that regard. The stop was not improper.

## II
### SCOPE OF THE SEARCH

■ The question remains whether the permissible scope of a *Terry* stop was exceeded by seizure of the cocaine in Pressley's possession. The scope of a search after a *Terry* stop is generally limited to a search for weapons, and then only when a reasonable belief exists that the defendant is armed and dangerous. *State v. Pimintel*, 55 Wn. App. 569, 571, 779 P.2d 268, *review denied*, 113 Wn.2d 1022 (1989). Where the actions of the person being detained give rise to a reasonable suspicion that the person possesses evidence which is in danger of being destroyed or lost, however, the investigating officer may take reasonable action, including seizure of evidence, consistent with the initial stop to further investigate and to protect the possible evidence. *Pimintel*, 55 Wn. App. at 572; *Dorsey*, 40 Wn. App. at 473. At that point, if probable cause exists or the elements of "plain view" are satisfied, no warrant is required for further examination of the evidence. *See Dorsey*, 40 Wn. App. at 473.

Here, Officer Korner saw a yellow item in Pressley's hand as he approached her, just before she put her hand in her coat pocket. Because he was aware that persons in the possession of narcotics may try to conceal them through a tear in the pocket of their coat, and because, given the location, it was possible that Pressley might have had a weapon, the officer did not go beyond the permissible scope of this investigatory stop in asking her to remove her hand or to show him what was in it. Had it not been for her furtive gesture, the officer's request may not have been justified. *See Pimintel*, 55 Wn. App. at 571-72; *Dorsey*, 40 Wn. App. at 473. That, however, was not the situation here.

The officer's request was further justified by the fact that here, as in *Glover*, Pressley replied "Nothing" when asked

what was in her hand.[2] In both cases, the officer had seen something in the defendant's hand and thus knew that, whatever it was, it was not "Nothing". *Glover*, 116 Wn.2d at 515. The officer's suspicions were not dispelled by the response given. Rather, Pressley's response both confirmed his suspicions and was consistent with the reason for the initial stop. Under these circumstances, Officer Korner's subsequent request that Pressley show him what she had in her hand was not unreasonable.

The officer's requests were directly related to dispelling or verifying his suspicions. The physical intrusion was minimal and limited to the defendant's closed hand, the contents of which she had tried to conceal. The search here therefore did not exceed the permissible scope of this *Terry* stop. Once the officer saw the packet and felt its contents, again taking into account his training and experience, there was probable cause to believe that Pressley was in possession of a controlled substance.

Affirmed.

WEBSTER, A.C.J., concurs.

BAKER, J. (dissenting) — I respectfully dissent.

Two female juveniles were standing near a street corner within a few feet of an open market store in the early evening hours. One, the defendant, had her hand open at chest level and appeared to be pointing at something in her hand. There was no indication of anything being handed from one to the other, and no money was being visibly offered from one to the other.

---

[2]While only four of the nine justices concurred in this aspect of the decision in *Glover*, three justices dissented with respect to this issue because they were of the opinion that there was no basis for any reasonable suspicion that the defendant was in possession of narcotics since the stop was based on the suspicion that Glover was trespassing, not that he possessed narcotics. In the case before us, in contrast, both the stop and the request were for purposes of investigating a possible narcotics violation. Thus, the request was consistent with the stop, and there was a reasonable basis for the officer's suspicion that the item in the defendant's hand contained illegal narcotics.

This was the scene when two Seattle police officers drove around the corner and saw the two juveniles standing across the street. Based primarily on the fact that drug transactions frequently occur in that neighborhood, the officers believed they were observing a drug transaction and decided to investigate. They drove rapidly across the street and stopped in the oncoming lane of traffic near the two girls.

The majority acknowledges that an insufficient basis then existed for a valid *Terry* stop. However, the majority concludes that the reaction of the two girls provided sufficient additional objective facts to justify the stop. The reaction of the appellant, when she saw the police car rapidly approaching her from across the street, was to mutter an expletive, turn and start to walk away with her hands in her pockets. Such actions are certainly consistent with a desire to avoid a confrontation with the police. They are not, however, sufficient to justify an investigatory stop under our cases.

I further disagree with the majority's conclusion that the search conducted by the detaining officer was valid. The State concedes there was no valid basis to search for a weapon under these circumstances. Indeed, the officer's testimony clearly establishes that he saw a yellow object which he thought might contain drugs, and it was that suspicion which caused him to direct the appellant to hand the object to him.

Neither *State v. Pimintel*, 55 Wn. App. 569, 779 P.2d 268, *review denied*, 113 Wn.2d 1022 (1989) nor *State v. Dorsey*, 40 Wn. App. 459, 698 P.2d 1109, *review denied*, 104 Wn.2d 1010 (1985) supports the majority opinion. In *Pimintel*, the officers had a valid search warrant to search premises and an unnamed individual who resembled the defendant for evidence of drug transactions. They found drugs and drug paraphernalia in the residence, and while the defendant was detained with hands spread against the wall, he tried to remove a packet of drugs from his pocket. Likewise, in *Dorsey*, probable cause to arrest was found to exist and the

defendant, while walking out of an airport after he was in custody, was seen to attempt to rid himself of an envelope, which was then seized.

By contrast, no facts exist in this case to justify any belief that evidence was about to be destroyed. The officer merely believed the appellant had drugs in her pocket and acted on that belief to confirm his suspicion. No case in this jurisdiction has yet gone as far as the majority opinion to justify such a seizure.

*State v. Glover,* 116 Wn.2d 509, 806 P.2d 760 (1991) discussed and distinguished in the majority opinion, does not contain any majority rationale which supports a stop and seizure on the facts of this case. In view of the fragile majority position in *Glover,* and the absence of a consistent supporting rationale as to these issues, I would not extend the holding in *Glover* to these facts.

Accordingly, I dissent.