[No. 17808-1-III. Division Three. September 30, 1999.]

THE STATE OF WASHINGTON, *Respondent*, v. RUBEN VILLARREAL, JR., *Appellant*.

638

*Hugh M. Spall, Jr.*, for appellant.

*Jeffrey C. Sullivan, Prosecuting Attorney*, and *Lauri M. Boyd, Deputy*, for respondent.

BROWN, J. — Ruben Villarreal, Jr. was found guilty of possessing cocaine following a stipulated-facts trial. Mr. Villarreal was urinating in public when contacted by a Yakima County deputy sheriff. He argues the initial contact with him was unreasonable. Alternatively he argues, if the contact was reasonable, the warrant check leading to his arrest and search unreasonably extended the scope of the investigative purpose. We disagree with both arguments, and affirm.

## FACTS

The parties stipulated to the facts contained in a Yakima County deputy sheriff's incident report related to Mr. Villarreal that occurred about 10:00 P.M. one June evening in 1998. Deputy J.L. Aguilar saw Mr. Villarreal walk back and

forth between two taverns, then urinate against a building. Deputy Aguilar approached Mr. Villarreal, then at 30 feet, and shined his flashlight at him. Mr. Villarreal turned toward the deputy exposing his penis. Then Mr. Villarreal began to walk away and zip up his pants. Deputy Aguilar identified himself and ordered Mr. Villarreal to freeze. Mr. Villarreal complied.

Deputy Aguilar asked for identification and requested a "wants" check while investigating the circumstances. The deputy saw a fresh puddle of urine and asked Mr. Villarreal why he did not use the tavern restrooms. Mr. Villarreal said he could not "hold it" any longer and admitted drinking four beers. Dispatch reported an outstanding warrant for Mr. Villarreal. Deputy Aguilar then arrested Mr. Villarreal pursuant to the warrant. During a search incident to the arrest, Deputy Aguilar discovered contraband including cocaine on Mr. Villarreal's person.

Mr. Villarreal was charged with possessing cocaine. He unsuccessfully moved to suppress the evidence. At the suppression hearing the parties relied on the deputy's incident report as the undisputed facts. The trial court took great care to enter findings of fact that Mr. Villarreal now largely disputes, together with all conclusions derived from the findings. Finding of Fact 3 states: "Urinating in public is more than a minor incident, it is one of the most serious health hazards facing society today." Finding of Fact 4 states: "The defendant's act of turning to face the Deputy, while the Defendant still had his penis exposed, raised the level of the incident." Finding of Fact 5 states: "Checking the Defendant for warrants was not overly intrusive because the existence of warrants is not an issue for legitimate expectation of privacy." Mr. Villarreal was found guilty after a trial on stipulated facts. Mr. Villarreal appealed.

## ANALYSIS

The issue is whether the trial court erred by denying Mr.

Villarreal's motion to suppress the cocaine and concluding (1) Deputy Aguilar's initial contact with Mr. Villarreal was reasonable; and (2) the warrant check did not exceed the scope of a reasonable investigative stop.

■ Whether a person has been seized under the Fourth Amendment is a mixed question of law and fact. " 'The resolution by a trial court of differing accounts of the circumstances surrounding the encounter are factual findings entitled to great deference,' but 'the ultimate determination of whether those facts constitute a seizure is one of law and is reviewed de novo.' " *State v. Armenta*, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997) (quoting *State v. Thorn*, 129 Wn.2d 347, 351, 917 P.2d 108 (1996)). Here, the parties agree Mr. Villarreal was seized for this analysis when Deputy Aguilar told Mr. Villarreal to "freeze."

■ The parties' agreement is consistent with the principle that not every encounter between a law enforcement officer and a person constitutes a seizure. *Armenta*, 134 Wn.2d at 10. Rather, " '[t]here is a 'seizure' when, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *State v. Young*, 135 Wn.2d 498, 510, 957 P.2d 681 (1998) (quoting *State v. Stroud*, 30 Wn. App. 392, 394-95, 634 P.2d 316 (1981), *review denied*, 96 Wn.2d 1025 (1982)).

■ ■ Mr. Villarreal focuses his argument on whether Deputy Aguilar had any legal basis under any ordinance or statute to believe Mr. Villarreal was committing a criminal act by urinating in public. "A seizure is reasonable if the State can point to 'specific and articulable facts giving rise to a reasonable suspicion that the person stopped is, or is about to be, engaged in criminal activity.' " *Armenta*, 134 Wn.2d at 10 (quoting *State v. Gleason*, 70 Wn. App. 13, 17, 851 P.2d 731 (1993)). In evaluating the reasonableness of a stop, courts consider the totality of the circumstances, including the officer's training and experience, the location of the stop and the conduct of the person detained. *See State v. Pressley*, 64 Wn. App. 591, 596, 825 P.2d 749 (1992). The inability of a police officer to articulate the exact crime

being committed does not preclude an investigative stop. *See State v. Mercer*, 45 Wn. App. 769, 775, 727 P.2d 676 (1986). Rather, police officers are encouraged to investigate suspicious situations. *Id.* "When officers have a reasonable suspicion, they may stop the suspect, identify themselves and ask the person detained for identification and an explanation of his or her activities." *State v. Madrigal*, 65 Wn. App. 279, 282, 827 P.2d 1105 (1992). "After a lawful investigatory stop, an officer may temporarily detain a suspect pending the results of a police headquarters radio check." *Id.* at 283.

Mr. Villarreal does not challenge the constitutionality of Harrah Town Ordinance No. 56 that provides in part:

> Section 1: The following persons are hereby declared to be disorderly persons:
>
> . . . .
>
> 29. Any person who shall dispose any rubbish or garbage or other offensive or nauseous substances in any public place or upon any property not belonging to him within the Town of Harrah.
>
> . . . .
>
> 31. Any person who shall conduct himself in a vulgar, profane or obscene manner, or shall use in the presence of any person any vulgar, profane or indecent language.
>
> . . . .
>
> Section 2: Any person found guilty of being a disorderly person shall be guilty of a misdemeanor . . . .

Thus, Ordinance 56 prohibits the disposal of "offensive or nauseous substances" and "vulgar" conduct.

■■■ The rules of statutory construction apply equally to municipal ordinances. *World Wide Video, Inc. v. City of Tukwila*, 117 Wn.2d 382, 392, 816 P.2d 18 (1991), *cert. denied*, 503 U.S. 986 (1992). When an ordinance is unambiguous, construction is not necessary as the plain meaning controls. *McTavish v. City of Bellevue*, 89 Wn. App. 561,

565, 949 P.2d 837 (1998). "When words are not defined by statute, the court may refer to dictionary definitions and to common usage in light of the context in which the word is used." *Armstrong v. State*, 91 Wn. App. 530, 538, 958 P.2d 1010 (1998), *review denied*, 137 Wn.2d 1011 (1999).

■ "Offensive" means, among other things: "2. unpleasant or disagreeable to the sense: *an offensive odor.*" RANDOM HOUSE DICTIONARY 1344 (2d ed. 1987). "Vulgar" means, among other things: "2. indecent; obscene; lewd. . . . 3. crude; coarse; unrefined." RANDOM HOUSE, *supra* at 2133. Here, the plain meaning of the statute supports the finding that Deputy Aguilar had specific and articulable facts to believe Mr. Villarreal was violating the Harrah ordinance. Urinating in public may constitute either "vulgar" conduct, as being particularly coarse or crude, or the disposal of an "offensive" substance. Thus, both come within the ordinance's prohibition of disorderly conduct.

Other jurisdictions have reached a similar conclusion. In New York, a defendant left a tavern and urinated under a street lamp less than a block away. *People v. Cooke*, 152 Misc. 2d 311, 578 N.Y.S.2d 76, 78 (1991). The court concluded public urination constituted the creation of a "physically offensive condition" under the disorderly conduct law. *Cooke*, 578 N.Y.S.2d at 78-79. In Nebraska a similar result has been reached. *State v. Cherry*, 185 Neb. 103, 173 N.W.2d 887 (1970). The court held urinating in public could constitute "indecent behavior" under a municipality's disorderly conduct ordinance. 173 N.W.2d at 888.

Here, Deputy Aguilar gave specific and articulable facts that provided a reasonable basis to continue his investigation of disorderly conduct. *See Nohre v. Commissioner of Pub. Safety*, 355 N.W.2d 757, 759 (Minn. Ct. App. 1984) (when officer observed the appellant urinating in the middle of the road, conduct which he believed to be in violation of a state disorderly conduct statute, the officer possessed sufficient specific and articulable facts to justify his investigatory stop). We conclude Deputy Aguilar's stop and

identification inquiry were reasonable under these circumstances.

 Additionally, after the suppression hearing, the State successfully moved to supplement the record with RCW 9.66.010 as a basis for the seizure. This statute partly provides: "A public nuisance is a crime against the order and economy of the state." RCW 9.66.010. It details certain persons, places, and activities that are proscribed including "[e]very act unlawfully done and every omission to perform a duty, which act or omission (1) [s]hall annoy, injure or endanger the safety, health, comfort, or repose of any considerable number of persons; or . . . (3) [s]hall . . . befoul . . . a public . . . street, [or] alley . . . [s]hall be a public nuisance." RCW 9.66.010.

Arguably subsections (1) and (3) apply here. First, the safety and health of the public at large is endangered by the improper disposal of human waste in a public place as described in these facts. Second, although the terminology is a bit antiquated, Mr. Villarreal "befouled" the place he urinated. The trial court found Deputy Aguilar detained Mr. Villarreal for urinating in public.

 Because the ordinances discussed and RCW 9.66.010 may serve as a basis for Deputy Aguilar's continued investigation, it is unnecessary to discuss other legal authorities mentioned in the briefing. The trial court did not base its decision on the Harrah ordinance. Nonetheless, this court "may [even] affirm a trial court's decision on a different ground if the record is sufficiently developed to consider the ground fairly." *State v. Sondergaard*, 86 Wn. App. 656, 657-58, 938 P.2d 351 (1997), *review denied*, 133 Wn.2d 1030 (1998). Here, the record is sufficiently developed. Further, the parties did discuss the Harrah ordinance before the trial court and in the briefing before this court.

 We note Deputy Aguilar's community caretaking function alternatively justified the initial encounter. This court has recently stated:

The police power is a fundamental purpose of government. It extends not only to the preservation of the public health, safety, and morals, but also to the preservation and promotion of the public welfare. This recognizes the community caretaking function of police officers and exists so they can assist citizens and protect property.

*Hudson v. City of Wenatchee*, 94 Wn. App. 990, 995-96, 974 P.2d 342 (1999) (concluding that allowing police officers to unlock vehicles promotes a fundamental purpose of government) (citations omitted). The trial court properly noted its concern for the health and public safety implications that may follow from the elimination of human waste in a public place. Common sense dictates that in a crowded and civilized society, a warning to desist because of the health implications is appropriate. Further, defacing or damaging private property is a proper concern for a law enforcement officer. *See State v. Sweet*, 44 Wn. App. 226, 236, 721 P.2d 560 (impoundment of defendant's vehicle and subsequent inventory search justified under community caretaking function where the vehicle's contents were threatened by theft), *review denied*, 107 Wn.2d 1001 (1986); *State v. Chisholm*, 39 Wn. App. 864, 867-68, 696 P.2d 41 (1985) (on remand trial court could determine, pursuant to community caretaking function, that officer could stop vehicle to warn occupants that an item of their property was endangered); *State v. Alexander*, 33 Wn. App. 271, 275, 653 P.2d 1367 (1982) (securing of van was an exercise of community caretaking function because the van was parked in a public place and the officer acted to protect the owner's property after the owner was taken into custody). It is appropriate for a law enforcement officer to contact a person suspected of urinating in public to address these concerns and take information that may be relevant to a property owner who may seek recovery for the defacement or damage that may be caused.

Next, we note the trial court correctly observed that after the officer decided to contact Mr. Villarreal, it was reasonable for the officer to report his location and circumstances to his dispatch for officer safety reasons. *Cf. State v.*

*Mitchell*, 80 Wn. App. 143, 146, 906 P.2d 1013 (1995) (reasonable concern for the officer's own safety warranted the officer waiting for backup before approaching the suspects), *review denied*, 129 Wn.2d 1019 (1996). "[I]t was okay and reasonable for the officer to call in to the station saying, look, here I am. I'm in the alley. I've got a guy here. I stopped him for urinating. His name is so and so and I'm going to deal with it." The court continued and explained the officer safety implications. "[I]t is ten o'clock at night. It's dark. It's in an alley. Shouldn't the officer be concerned about checking in and telling people what is going on?"

■ Mr. Villarreal also contends that, even if the seizure were reasonable, the trial court should have suppressed the seized contraband because the warrant check exceeded the scope of the investigatory stop. A warrant check during a valid criminal investigatory stop is a reasonable routine police procedure so long as the duration of the warrant check does not unreasonably extend an initially valid contact. *State v. Chelly*, 94 Wn. App. 254, 261, 970 P.2d 376, *review denied*, 138 Wn.2d 1009 (1999); *State v. Williams*, 50 Wn. App. 696, 700, 750 P.2d 278 (1988). We have decided the initial contact was valid. Nothing in the record indicates the deputy's call to dispatch unreasonably extended the duration of the stop. *See Chelly*, 94 Wn. App. at 261. Moreover, the trial court reasoned correctly that an officer may call in his or her location and activity to enhance the officer's personal safety under the circumstances presented here.

## CONCLUSION

We hold the trial court did not err when denying Mr. Villarreal's suppression motion. Deputy Aguilar's initial contact to investigate a person observed urinating in public was reasonable. The warrant check following the initial contact and while the investigation continued did not exceed the scope of this investigative stop.

Affirmed.

KATO, J., concurs.

Schultheis, C.J. (dissenting) — This record does not show that Yakima County Deputy Sheriff J.L. Aguilar had a reasonable suspicion Ruben Villarreal, Jr., was engaged in criminal activity. The resulting seizure and search were therefore unjustified.

First, the deputy was not engaged in a community caretaking function when he seized Mr. Villarreal. The community caretaking exception to the warrant requirement involves police-citizen contact initiated for noncriminal, noninvestigatory purposes. *State v. Lynch*, 84 Wn. App. 467, 477, 929 P.2d 460 (1996). To determine whether a community caretaking encounter is reasonable, the trial court must balance the individual's interest in freedom from police interference against the public's interest in having the police perform the caretaking function. *State v. Mennegar*, 114 Wn.2d 304, 313, 787 P.2d 1347 (1990); *Lynch*, 84 Wn. App. at 477. The court did not balance the conflicting interests of Mr. Villarreal and the community, on the record, because it did not apply the community caretaking exception. Consideration of the community caretaking exception is then beyond the scope of this appeal and our authority. We may not substitute our findings for those of the trial court. *Sparks v. Douglas County*, 127 Wn.2d 901, 910, 904 P.2d 738 (1995); *State v. McAlpin*, 36 Wn. App. 707, 713, 677 P.2d 185, *review denied*, 102 Wn.2d 1011 (1984).

Second, and more importantly, the trial court erroneously concluded that the Yakima County Code authorized this seizure. Section 12.05.070 of the Yakima County Code prohibits disposal of human or animal excrement on public or private property. The town of Harrah is, however, a separate municipal corporation and so exercises its police powers within its boundaries. Wash. Const. art. XI, § 11.[1] *See, e.g., Brown v. City of Cle Elum*, 145 Wash. 588, 589, 261 P. 112, 55 A.L.R. 1175 (1927). The Harrah disorderly conduct

---

[1]"Any county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws." Wash. Const. art. XI, § 11.

ordinance prohibits disposal of "offensive or nauseous substances[.]" Harrah Town Ordinance No. 56, § 1(29). Here the trial court could not and did not conclude that the Harrah ordinance authorized Mr. Villarreal's seizure. Urine does not come within the plain meaning of an offensive or nauseous substance.[2]

Ultimately, the question is whether Deputy Aguilar had specific and articulable facts leading to a reasonable belief that Mr. Villarreal was engaged in criminal activity. Any recognized exception to the warrant requirement—like the community caretaking function or the investigatory stop—is limited by the reason that calls it into existence. *State v. Ladson*, 138 Wn.2d 343, 356, 979 P.2d 833 (1999). The exception may not be used as a pretext to conduct an unrelated criminal investigation. *Id.* at 357. For the sake of the rule of law let us be realistic—the deputy here did not believe that Mr. Villarreal was disposing of "any rubbish or garbage or other offensive or nauseous substances[.]" Harrah Town Ordinance No. 56, § 1(29). He therefore had no authority to seize Mr. Villarreal.

Review denied at 140 Wn.2d 1008 (2000).

---

[2]WEBSTER'S THIRD INTERNATIONAL DICTIONARY 1508, 1566 (1969) defines the terms as follows: (1) nauseous: "causing or such as might be expected to cause nausea"; (2) offensive: "giving painful or unpleasant sensations."