

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2013 DEC -3 AM 10: 19

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| | ) | |
| Appellant, | ) | No. 69753-6-I |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MILAHN NATHANIEL MOORE, | ) | |
| | ) | |
| Respondent. | ) | FILED: December 9, 2013 |
| | ) | |

DWYER, J. — The State charged Milahn Moore with residential burglary, in violation of RCW 9A.52.025.[1] After holding a CrR 3.6[2] hearing, the trial court granted Moore's motion to suppress evidence obtained pursuant to an unlawful stop of Moore by police. The State appeals,[3] contending that the trial court erred in finding that the police officers lacked the specific, articulable suspicion necessary to authorize Moore's detention.

We conclude that the police lawfully stopped Moore, as the officers had a reasonable, articulable suspicion that Moore was involved with a suspected

---

[1] RCW 9A.52.025 provides, in pertinent part, "[a] person is guilty of residential burglary if, with intent to commit a crime against a person or property therein, the person enters or remains unlawfully in a dwelling."

[2] Superior Court Criminal Rule 3.6 provides, in pertinent part: "(a) . . . Motions to suppress physical, oral or identification evidence . . . shall be in writing . . . . Opposing counsel may be ordered to serve and file a memorandum of authorities in opposition to the motion. The court shall determine whether an evidentiary hearing is required based upon the moving papers. . . . (b) . . . If an evidentiary hearing is conducted, at its conclusion the court shall enter written findings of fact and conclusions of law."

[3] Pursuant to Rule 2.2 of the Rules of Appellate Procedure, the State may appeal a "pretrial order suppressing evidence, if the trial court expressly finds that the practical effect of the order is to terminate the case." RAP 2.2(b)(2).

No. 69753-6-I

burglary of an abandoned house. We therefore reverse the trial court's ruling granting Moore's motion to suppress and remand the cause for further proceedings.

I

Neale Frothingham lived at 8626 Wabash Avenue South in Seattle.[4] In the afternoon of January 17, 2012, he "heard some glass breaking." He went out into the street and saw four individuals fleeing from the area near Bobbi Jenkins' house, located at 8620 53rd Avenue South. Frothingham followed them and called 911 at 1:54 p.m. The four individuals went into another house nearby. Frothingham watched two of the individuals re-emerge from the house and get into a car. He gave the 911 operator a description of the car and its direction of travel before terminating the 911 call and returning home.

Responding officers located the car and two suspects. The officers believed that "one of the suspects may have ditched a firearm" in the area, so they requested that Seattle police officers Matthew Hurst and Jason Suarez look for the gun.

About two hours after the first incident, Frothingham again heard glass breaking. He ran out to the street and saw Moore[5] "running out of the back of [Jenkins'] house toward [him]." Moore saw Frothingham, "then stopped and

_____

[4] "The witnesses described this as a high crime area." Finding of Fact 1 (CrR 3.6 hearing).
[5] At the time of Moore's initial interaction with Frothingham and police, Moore's identity was not known. His name was discerned after he encountered the police. It is for clarity's sake that he is referred to by his surname at this point in this recitation of facts.

- 2 -

turned and fled southbound down the alley."[6] Frothingham initially chased Moore, but then slowed down to grab his cell phone from his pocket to call 911. Frothingham spoke with the 911 operator as he watched Moore stop at the end of the alley, turn back and look at him for two to three seconds, jump over the fence on the south side of the alley into a yard, and run through the yard toward Hamlet Avenue South. Frothingham described Moore's appearance to the 911 operator, stating that he was tall, thin, and wearing a knit cap and red sports jacket.

At 3:29 p.m., as Hurst and Suarez drove through the area looking for the missing gun, they received a broadcast stating that three males had possibly entered an abandoned house[7] nearby, at 8712 Hamlet Avenue South. This broadcast originated from a 911 call placed by another neighbor, Ashley Gunderson, who lived at 8715 Hamlet Avenue South. At the CrR 3.6 hearing,[8] Suarez read from the Computer Aided Dispatch (CAD) log, which indicated that at 3:28 p.m.: "complainant reporting she saw three males go into the backyard of an abandoned house, unknown if they made entry, but there is history of people entering the house;" and, "suspect description, three BM's, which stands for black males, 15 to 18 years old. Number 1, referring to number 1 of the suspects, PUR, which is purple sweater, and unknown for other two suspects." Because Hurst and Suarez were already close by, driving northwest through the

---

[6] The alley is Grattan Place South.

[7] The abandoned house is not Jenkins' house.

[8] The court held the CrR 3.6 hearing pursuant to Moore's motion to suppress evidence of his identification by Neale Frothingham. At this hearing, Moore also moved to suppress all evidence obtained pursuant to his stop because the officers detained Moore pursuant to the abandoned house call, not Frothingham's last call regarding the burglary for which Moore was arrested. The testimony described herein all occurred during this hearing.

No. 69753-6-I

8700 block of Hamlet Avenue South, they notified dispatch at 3:31 p.m. that they would respond to the call.

Immediately after speaking with dispatch, Hurst "observed [Moore] cutting through a few yards and end up walking northbound on Hamlet." The abandoned house was about half of a block away from their location. Hurst thought that Moore might have been trespassing[9] in the yard at 8728 Hamlet Avenue South. He also noticed that Moore had a look of "fear" or "panic" on his face[10] and that there was dirt or dust on the back shoulder of Moore's otherwise clean jacket. Hurst saw Moore sprint through the yard, but when Moore reached Hamlet Avenue South, "he slowed down" to a walk; it appeared that Moore stopped running because he saw the patrol car. Suarez did not see Moore running, only "walking northbound . . . on Hamlet, and then he turned southbound on 53rd."

The officers decided to stop Moore to investigate the situation. Hurst "got out and indicated to [Moore] that he needed to stop and come back to [their] patrol car." Moore was "very cooperative" and came right over to the patrol car. Hurst asked Moore whether he lived at the house with the yard through which he had just run. Moore said that he did not.

---

[9] Pursuant to RCW 9A.52.080(1), "[a] person is guilty of criminal trespass in the second degree if he or she knowingly enters or remains unlawfully in or upon premises of another."

[10] At the hearing, Moore's counsel asked Hurst to explain what about Moore's expression and body language led Hurst to think that Moore looked fearful. Hurst replied, "I don't know how to describe the look on someone's face. Obviously I think we all know what different facial expressions look like, and was he actually fearful? I don't know. I got the impression when I saw him that . . . fear, panic, something, and he's running fast. Body language, . . . he's not just doing a little stroll, a jog . . . . I mean he's sprinting and he has that look on his face like . . . maybe someone's chasing him, or something like that . . . . And even more so than I'm sprinting because I'm . . . late."

At 3:33 p.m., the officers radioed to dispatch that they had stopped Moore. Almost immediately, also at 3:33 p.m., "a broadcast came out" from dispatch stating that another burglary had occurred in the area. Hurst radioed back that they had stopped someone and asked for the description of the suspect from that burglary. A minute or two later, Frothingham's description of the suspect that he saw at Jenkins' house was radioed back to the officers. The description matched Moore.

Hurst broadcasted that the officers had detained a possible suspect and arranged a "showup" identification with Frothingham. Frothingham subsequently identified Moore as the individual that he had seen coming from Jenkins' house and chased down the alley. Suarez placed Moore in the patrol car and, after speaking with Frothingham, Hurst handcuffed Moore and gave him his Miranda[11] warnings.

The State charged Moore with residential burglary for entering the dwelling of Bobbi Jenkins with the intent to commit a crime therein. On December 6, 2012, the trial court held a CrR 3.6 hearing.

At the hearing, the officers explained why they stopped Moore. Suarez testified that they "stopped [Moore] to hopefully ID him" and "to see what the situation was with the possible three males in the area possibly breaking into the house." Hurst's police report, written that day at 6:00 p.m., states, "[g]iven the two calls in the area, I believed that A/Moore might be involved." Hurst testified that after receiving the call about a possible trespass at the abandoned house,

---

[11] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

he thought:

> [W]e'll find out what their description is later, let's get [Moore] stopped because he's running right now because he can get away. Maybe he just broke in the house and the person saw him and they're calling and he doesn't know there's a police car. All those things, you have to make a quick decision, he needs to be stopped. . . . If he's not involved, hopefully we'll find that out and get him on his way.

Hurst also testified that, knowing that the suspects in the abandoned house call were "three males, two they . . . couldn't provide a description, and one had a purple sweater," Moore "could have been one of the [two] males" not wearing a purple sweater. He remembered: "here's the call, and then all of a sudden here comes Mr. Moore running out of the yard."

Hurst testified that his reasons for stopping Moore were: (1) the 911 call from Gunderson, indicating that three males were breaking into an abandoned house; (2) "[a]bout that same time is when we saw Mr. Moore sprinting though the yard," so Hurst "kind of wondered if the two things were related"; (3) Hurst "suspected that [Moore] was [trespassing], just by the way he was running through the yard," because "generally you don't . . . sprint through your own yard. . . . It looked a little unusual"; and, (4) "the dust on [Moore's] jacket gave [Hurst] the impression that maybe [Moore] had just been crawling through a window or crawling through a bush," and Hurst thought it was unusual to "see somebody that's otherwise clean that seems to have some dust or dirt on him."[12] Hurst testified, "[a]t that point I believe that we had reasonable suspicion to stop him."

The trial court granted Moore's motion to suppress evidence on December

---

[12] Hurst also testified that, based on Moore running through the yard and the dirt alone, without information concerning the abandoned house incident, he would not have stopped Moore.

No. 69753-6-I

12, 2012, and entered its findings of fact and conclusions of law on December

14, 2012. The State appeals.

II

The State contends that the trial court erred in determining that the officers

did not have a reasonable, articulable suspicion to justify stopping Moore.[13] This

is so, the State asserts, because the officers rationally inferred, based on the

totality of the circumstances, that Moore was trespassing as he sprinted across

---

[13] The State also asserts that the trial court erred in entering findings of fact 5, 6, and 7. Challenged findings of fact will be upheld on appeal if they "are supported by substantial evidence." State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003); accord State v. Hill, 123 Wn.2d 641, 647, 870 P.2d 313 (1994).

The trial court did not err in entering finding of fact 5, which stated that the information regarding the abandoned house "was broadcast at 3:29 p.m.," because it is supported by substantial evidence in the record. The CAD log says "(M) BCAST" at 3:29 p.m. Nowhere prior to 3:29 p.m. does the log state "(M) BCAST" or that the information was relayed to Hurst and Suarez. At the hearing, Suarez also read from the CAD log that the information was broadcast at 3:29 p.m.

The trial court erred in entering finding of fact 6, which states that Moore "was not looking back as if he were being pursued" while he ran through the yard. When asked whether Moore was "looking back as if he was checking if someone was pursuing him," Hurst testified, "I don't recall. It's possible, but I don't remember." There was no other testimony on this matter. Therefore, this portion of finding of fact 6 was not supported by substantial evidence.

Finding of fact 6 also states that the "court does not put significant weight on this testimony in light of all the circumstances and [Hurst's] inability to articulate what he observed that led him to believe the young man was frightened." As the trier of fact, the trial court is entitled to consider testimony based on the credibility of the witness. Morse v. Antonellis, 149 Wn.2d 572, 574, 70 P.3d 125 (2003); Hill, 123 Wn.2d at 646. The trial court explicitly stated, in finding of fact 12, that "Officer Hurst . . . [was] found by this court to be credible." Because the court found Hurst to be credible, and his testimony was the only evidence on whether Moore looked frightened, finding of fact 6 was contrary to the evidence to the extent that it negates the evidence of Moore's frightened expression.

Furthermore, the legal significance the trial court attributed to evidence of Moore's expression properly belonged in its conclusions of law, where the trial court made its suppression determination, not the findings of fact. "A conclusion of law erroneously described as a finding of fact is reviewed as a conclusion of law." Willener v. Sweeting, 107 Wn.2d 388, 394, 730 P.2d 45 (1986); accord State v. Gaines, 122 Wn.2d 502, 508, 859 P.2d 36 (1993). The significance of Moore's expression will therefore be reviewed de novo, along with the other conclusions of law challenged by the State. See State v. Gaines, 154 Wn.2d 711, 716, 116 P.3d 993 (2005).

The trial court similarly erred in entering finding of fact 7, which states that Moore's jacket had dirt on the back, "which would have been of unclear relevance with reference to the abandoned house call." As a police officer, Hurst was entitled to infer, as he testified, that based on the dirt, "maybe [Moore] had just been crawling through a window or crawling through a bush." Hurst considered the dirt to be relevant; the trial court's interpretation of its relevance is not a factual finding. The trial court's determination of "relevance" is a conclusion of law, to which this court is not required to defer. See Gaines, 154 Wn.2d at 716; Willener, 107 Wn.2d at 394.

the yard and that he might have been involved in the incident at the abandoned house. This, the State contends, constituted a reasonable, articulable suspicion of criminal activity and justified the Terry[14] stop. We agree.

"The constitutionality of a warrantless stop is a question of law we review de novo." State v. Gatewood, 163 Wn.2d 534, 539, 182 P.3d 426 (2008); see State v. Acrey, 148 Wn.2d 738, 745, 64 P.3d 594 (2003).

Under the Fourth Amendment of the United States Constitution and article I, section 7 of the Washington Constitution, police may conduct "an investigative or Terry stop" so long as it is reasonable. State v. Glover, 116 Wn.2d 509, 513, 806 P.2d 760 (1991). "Officers may briefly, and without warrant, stop and detain a person they reasonably suspect is, or is about to be, engaged in criminal conduct." State v. Day, 161 Wn.2d 889, 895, 168 P.3d 1265 (2007). Conducting a Terry stop requires "[l]ess than probable cause . . . because the stop is significantly less intrusive than an arrest." State v. Kennedy, 107 Wn.2d 1, 6, 726 P.2d 445 (1986); see State v. Gluck, 83 Wn.2d 424, 426, 518 P.2d 703 (1974) ("where officers entertain a well-founded suspicion not amounting to probable cause [for arrest], they may stop the suspected person, identify themselves and require the suspect to identify himself and explain his activity").

The stop is justified when "the officer can 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" Glover, 116 Wn.2d at 514 (quoting Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). In determining whether a

---

[14] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

stop was reasonable, a court should consider "'the totality of the circumstances known to the officer at the inception of the stop.'" State v. Lee, 147 Wn. App. 912, 917, 199 P.3d 445 (2008) (quoting State v. Rowe, 63 Wn. App. 750, 753, 822 P.2d 290 (1991)); accord Gatewood, 163 Wn.2d at 539; Day, 161 Wn.2d at 896. The totality of the circumstances includes such factors as the training and experience of the investigating officer, the location of the stop, and the conduct of the person stopped. Acrey, 148 Wn.2d at 747; Glover, 116 Wn.2d at 514; see Illinois v. Wardlow, 528 U.S. 119, 124-25, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000) (the location of the stop in a high crime area and the conduct of the person stopped, such as "unprovoked flight upon noticing the police" and "nervous, evasive behavior," are "pertinent factor[s] in determining reasonable suspicion"); State v. Pressley, 64 Wn. App. 591, 597, 825 P.2d 749 (1992) (officer's experience with drug transactions and the area, along with the reaction of the person stopped, were relevant factors). "Moreover, 'the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.'" Lee, 147 Wn. App. at 917 (quoting Wardlow, 528 U.S. at 125).

It "is well established that, '[i]n allowing . . . detentions, Terry accepts the risk that officers may stop innocent people.'" Lee, 147 Wn. App. at 918 (first alteration in original) (quoting Wardlow, 528 U.S. at 126)). "However, despite this risk, '[t]he courts have repeatedly encouraged law enforcement officers to investigate suspicious situations.'" Lee, 147 Wn. App. at 918 (alteration in original) (quoting State v. Mercer, 45 Wn. App. 769, 775, 727 P.2d 676 (1986)).

No. 69753-6-I

"Citizens of this state expect police officers to do more than react to crimes that have already occurred. They also expect the police to investigate when circumstances are suspicious." State v. O'Neill, 148 Wn.2d 564, 576, 62 P.3d 489 (2003); see Terry, 392 U.S. at 22; Kennedy, 107 Wn.2d at 5-6 ("crime prevention and crime detection are legitimate purposes for investigative stops or detentions"). Therefore, when a suspect's "activity is consistent with criminal activity, although also consistent with noncriminal activity, it may justify a brief detention." Kennedy, 107 Wn.2d at 6; accord United States v. Arvizu, 534 U.S. 266, 274, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002); Terry, 392 U.S. at 22.

As stated, police officers may rely on their training and experience in forming suspicions of criminal activity. Arvizu, 534 U.S. at 273, 276. In Glover, "officers approached Glover because they felt that he was acting suspiciously":

> Glover initially walked toward the officers but, upon seeing the police, he turned and walked in the opposite direction. . . . The suspicious behavior included Glover's turning away from the officers, walking faster, looking toward the officers and then looking away, and playing with his baseball cap by taking it off and twisting it around.

116 Wn.2d at 512. The officers' experience, the location, and Glover's conduct constituted reasonable suspicion warranting his detention. Glover, 116 Wn.2d at 514. Similarly, in Arvizu, a border control agent's stop of a minivan was reasonable because, although the actions of the van's occupants could also have had innocent explanations, the agent's suspicion, based on his experience and the totality of the circumstances, justified the stop. 534 U.S. at 277-78. The agent "was entitled to make an assessment of the situation in light of his specialized training and familiarity with the customs of the area's inhabitants."

- 10 -

Arvizu, 534 U.S. at 276. Simply because "each observation . . . was by itself readily susceptible to an innocent explanation," did not mean that, when taken together, the agent's observations did not warrant further investigation. Arvizu, 534 U.S. at 274.

Considering the totality of the circumstances, Officers Hurst and Suarez conducted a reasonable Terry stop of Moore. They relied on articulable facts and their experience as police officers in drawing the rational inference that Moore may have been involved in the abandoned house incident.

The totality of the circumstances justified the stop because: (1) the events occurred in a high crime area; (2) a burglary had occurred a block away two hours prior, involving two suspects that had not yet been apprehended; (3) a second suspected burglary had occurred half of a block away minutes before, involving two suspects with descriptions that could include Moore; (4) Hurst observed Moore sprinting through a yard in a way that suggested that Moore did not live there; (5) Moore's expression was panicked or frightened; (6) there was dirt on Moore's otherwise clean jacket; and (7) Moore slowed to a walk when he saw the police car and began walking away from the police.

Even without considering Moore's expression or the dirt on his jacket,[15] Moore's conduct in sprinting through the yard, slowing upon seeing police and walking in the opposite direction, the timing of his conduct only two hours after a reported burglary and minutes after another suspected burglary, and the location of his conduct within a block of both incidents, were sufficient to justify the stop.

_____

[15] The trial court did not credit this evidence in making its determination. See Findings of Fact 6, 7.

- 11 -

See, e.g., Glover, 116 Wn.2d at 512 (the stop was justified when Glover changed direction after seeing police and walked faster, causing officers to think that he "was acting suspiciously"); Pressley, 64 Wn. App. at 597 (the stop was justified when Pressley and another woman "huddl[ed] together and examin[ed] an item in Pressley's hand," suggesting "a narcotics transaction"; Pressley stated, "'Oh Shit,'" upon noticing the officer; and, both women "immediately walked in different directions"); State v. Guzman-Cuellar, 47 Wn. App. 326, 330, 734 P.2d 966 (1987) (the stop was justified when the officer observed Guzman-Cuellar "leave the driveway of one residence, cross the street and enter the fenced side yard of another residence shortly after 2 a.m.," and the officer "thought the man might be a prowler").

Each of the cited facts alone might not individually be sufficient, but when taken together they justify the Terry stop. See, e.g., Arvizu, 534 U.S. at 270-71, 276; Wardlow, 528 U.S. at 121, 126 (stopping Wardlow was justified when he fled upon seeing officers in "an area known for heavy narcotics trafficking"); Terry, 392 U.S. at 22 (the stop was justified when the officer observed the men "go through a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation"); Glover, 116 Wn.2d at 512.

The totality of the circumstances indicated that there was a substantial possibility that criminal conduct had occurred. See Kennedy, 107 Wn.2d at 6. These observations may have had innocent explanations, as the trial court pointed out, but they were also consistent with criminal activity; therefore, the

No. 69753-6-I

officers were justified in briefly detaining Moore.[16] See Arvizu, 534 U.S. at 277; Wardlow, 528 U.S. at 125; Terry, 392 U.S. at 23; Kennedy, 107 Wn.2d at 6.

The officers stopped Moore based on their reasonable, articulable suspicion that he was involved with the abandoned house incident, pursuant to facts that they personally and collectively observed and their rational inferences therefrom. Hurst specifically articulated three separate times at the hearing that he based the stop on the recently reported suspected burglary at the abandoned house, the way that Moore sprinted through the yard, and the dirt on Moore's otherwise clean jacket. Both officers also testified that they thought that Moore might have been one of the suspects from the abandoned house incident. Hurst testified that upon receiving the 911 call about the abandoned house incident, at "[a]bout that same time . . . [he] saw Mr. Moore sprinting through the yard" so he "kind of wondered . . . if the two things were related." See Guzman-Cuellar, 47 Wn. App. at 331 ("The suspicious nature of the activity may be considered in conjunction with the time of occurrence.").

Moore also ran through the yard at a sprint, "not just doing a little stroll [or] a jog." Hurst rationally inferred that Moore was trespassing in the yard, as Moore's conduct was "unusual": "generally you don't . . . sprint through your own yard." Furthermore, in Hurst's experience, "generally when people are doing

---

[16] The trial court examined the facts and explained that an innocent motivation could have existed behind each; however, this sort of analysis fails to consider the totality of the circumstances. See Arvizu, 534 U.S. at 274; State v. Marcum, 149 Wn. App. 894, 907, 205 P.3d 969 (2009). In Terry, there was "nothing unusual in two men standing together on a street corner, perhaps waiting for someone. Nor [was] there anything suspicious about people in such circumstances strolling up and down the street, singly or in pairs. Store windows, moreover, are made to be looked in." 392 U.S. at 22-23. However, this same conduct also could have been criminal: the men could have been preparing to steal from the stores. Terry, 392 U.S. at 22, 28. The stop in that seminal case was reasonable. Terry, 392 U.S. at 28.

- 13 -

something wrong, they tend to run when they get found." Moore then slowed to a walk upon seeing the patrol car. Reactions to the presence of police are further indications of criminal activity. See Glover, 116 Wn.2d at 512; Pressley, 64 Wn. App. at 597. Indeed, the "reasonable person test presupposes an *innocent* person." Florida v. Bostick, 501 U.S. 429, 438, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991) (internal quotation marks omitted). Had Moore been an innocent person running away from a threat of harm, it would not have been logical for him to walk away from the police, rather than seek their aid. Hurst stopped Moore "'based on [his] commonsense judgments and inferences about human behavior.'" Lee, 147 Wn. App. at 917 (quoting Wardlow, 528 U.S. at 125).

The training and experience of Hurst and Suarez further supports the reasonableness of their decision to detain Moore. See Arvizu, 534 U.S. at 277; Glover, 116 Wn.2d at 514; Pressley, 64 Wn. App. at 597. Police officers are entitled to observe a person's behavior or demeanor; and, based on their experience, investigate further if they find that person's behavior or demeanor to be suspicious. See Arvizu, 534 U.S. at 273 (a totality of the circumstances analysis "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person'") (quoting United States v. Cortez, 449 U.S. 411, 418, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)); Terry, 392 U.S. at 23; Glover, 116 Wn.2d at 514.

Both officers had experience responding to 911 calls, in South Seattle, and with crimes such as burglaries and property crimes. The officers properly

relied on their training and experience in rationally inferring that Moore's conduct was consistent with criminal activity and that Moore could have been involved with the abandoned house incident. It "would have been poor police work indeed" for Hurst and Suarez, officers experienced in investigating burglaries "in this same neighborhood[,] to have failed to investigate this behavior further." Terry, 392 U.S. at 23.

Based upon the facts articulated by the officers, the rational inferences drawn therefrom, and the totality of the circumstances, which included the officers' experience, their location, and Moore's conduct, the Terry stop was lawful. The trial court therefore erred in granting Moore's motion to suppress.

Reversed.

Dwyer, J.

We concur:

Spearman, A.C.J.

Becker, J.