## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | DIVISION ONE |
| Respondent, | ) | |
| | ) | No. 77767-0-I |
| v. | ) | |
| | ) | PUBLISHED OPINION |
| MICHAEL CLIFFORD BOISSELLE, | ) | |
| | ) | |
| Appellant. | ) | FILED: April 16, 2018 |
| | ) | |

DWYER, J. — Michael Boisselle was charged and convicted of second degree murder and unlawful possession of a firearm. On appeal, Boisselle contends that the trial court erred by denying his motion to suppress and by refusing to instruct the jury concerning justifiable homicide in resistance of a felony. Boisselle also contends that the prosecutor committed flagrant misconduct during rebuttal closing argument, thus depriving him of a fair trial. Finding no error, we affirm.

I

In July 2014, Michael Boisselle encountered Brandon Zomalt, an old acquaintance. Zomalt told Boisselle that he was homeless, had nowhere to sleep, and that he needed assistance obtaining a food handler's permit in order to secure a job. Boisselle offered to let Zomalt stay with him in his duplex unit.

With Boisselle's assistance, Zomalt received his food handler's permit and began working at a nearby restaurant. However, Zomalt was fired after one

week for fighting at work. Zomalt was addicted to alcohol and methamphetamine. He also had a history of violence. Several people, including Zomalt's mother and two of his former girlfriends, had been granted protection orders against him. After losing his job, Zomalt drank throughout the day. Boisselle did not feel safe around Zomalt and avoided him when possible.

Boisselle asked Zomalt to move out in the beginning of August. Zomalt apologized for his behavior and asked for another chance. Boisselle agreed to let Zomalt stay, but Zomalt's behavior thereafter worsened. Boisselle believed that Zomalt was following him when he left the duplex. One night, Boisselle woke up to discover Zomalt beside the bed, staring at him. When Boisselle asked Zomalt what he was doing, Zomalt stated that he wanted to ask Boisselle something but changed his mind.

One morning, after Boisselle and Zomalt began to argue, Boisselle left the duplex to go to a nearby store. Zomalt followed Boisselle to the store, yelling at him the entire way. Boisselle tried to avoid Zomalt when he returned home. Boisselle went to his bedroom on the second floor of the duplex while Zomalt sat on the couch downstairs, consuming alcohol. Later that night, still in his bedroom, Boisselle told Zomalt that he could not stay at the duplex any longer. Zomalt refused to leave. Boisselle threatened to call the police. Zomalt again refused to leave, prompting Boisselle to grab his jacket and walk downstairs.[1]

---

[1] Boisselle testified that he did not own a cell phone and would need to call the police using someone else's telephone.

Before he could leave, Zomalt pulled out a gun and pointed it at Boisselle. Boisselle went back upstairs to his bedroom.

Boisselle could look over the living room from the upstairs railing. Later, from that vantage point, he saw Zomalt sitting on the couch with the gun placed on the arm of the couch. Boisselle went downstairs and into the kitchen, where he pretended to get something to drink. Upon leaving the kitchen, Boisselle grabbed the gun from the arm of the couch.

At trial, Boisselle testified about what happened next:

Q    After you grabbed the gun, what did [Zomalt] do?
A    He stood up, turned and started coming in my direction.
Q    And what did you think he was going to do at that point?
A    I thought he was going to come and grab that gun from me. I grabbed the gun, he reacted, turned, and he was coming so. . .
Q    What did you do?
A    I turned and I fired a few times.
. . . .
Q    Now, how far away were you when you were firing these shots?
A    From the love seat to the stairs. I don't know exactly that distance, but I know that it's not a very far distance at all.
Q    And at that time he was coming at you?
A    Yes.

On September 1, 2014, South Sound 911 dispatch received an anonymous telephone call from an individual who reported that "somebody by the name of Mike" stated that he shot someone at 13008 Military Road East, No. B (the duplex). Shortly thereafter, the Puyallup Police Department anonymous tip line received a telephone call from an individual who reported that "Mike" had "shot someone" and "possibly killed him, and it was in self-defense." Deputies Ryan Olivarez and Fredrick Wiggins were dispatched to the scene, arriving at

6:50 p.m. Sergeant Christopher Adamson arrived shortly thereafter, at approximately 7:13 p.m. Sergeant Erik Clarkson arrived at the scene at 7:17 p.m.

Olivarez and Wiggins knocked on the door of the duplex but received no response. There was, however, a dog inside that was barking aggressively.[2] The deputies walked around the outside of the duplex and attempted to look inside, but all of the windows were closed and covered with blinds. There was a light on in the upstairs western bedroom. The deputies smelled a foul odor coming from the house and the garage. Olivarez thought that "something about it just seemed off" and was concerned with "trying to figure out if someone need[ed] help." Olivarez and Wiggins then contacted the neighbors in order to gather more information. Two neighbors informed the deputies that they had not seen anyone coming or going from the duplex for about "four or five days."

Adamson listened to the anonymous telephone call made to the Puyallup tip line. Because the anonymous caller provided few details, Adamson was worried "about whether someone was dead or dying in the house." When he arrived, Adamson searched for evidence to substantiate the anonymous telephone calls. Adamson smelled a faint odor coming from the garage that he believed was decaying flesh. Adamson spoke with a neighbor, who told him that a sex offender named Boisselle lived in the duplex. Adamson confirmed that information through the sex offender registry. However, several entries in the

---

[2] Sergeant Clarkson described the dog as "a half something mixed between a pit bull and some other breed," and stated that the dog was "[m]edium size, but very aggressive."

computer aided dispatch log indicated that Boisselle did not live at the duplex anymore and that his current location was unknown.

Adamson directed Olivarez to identify and contact the owner of the duplex. Olivarez contacted the owner and learned that he had rented the duplex to a woman who had stopped paying rent. The owner believed that there was a man named Michael living in the duplex who may be the son of the woman, but the owner had been unable to get Michael to pay rent. As a result, the owner was forced to file for bankruptcy and no longer owned the house. Based on the owner's statements, Adamson did not believe that the owner could give valid consent for the police to enter the duplex.

Wiggins checked the license plates of the two vehicles parked in the driveway of the duplex through the Department of Licensing and learned that Lola Patterson was the registered owner of both vehicles. Wiggins drove to Patterson's last known address and spoke with her personally. Wiggins learned that Patterson was Michael's[3] mother and that Patterson had not seen or heard from Michael in about three days. Adamson believed that this information "just adds to the concern that we have somebody that is potentially down in the apartment or the duplex" because he could not "account for Mike, or whoever the victim is."

Upon arriving at the duplex, Clarkson also noticed a "really bad odor" that "might be rotting garbage, or something like that" coming from the garage.

---

[3] Although Adamson knew that Michael Boisselle once lived in the duplex, it is not clear that the other officers knew Michael's last name. None of the officers knew whether the individual who presently resided in the duplex was Michael Boisselle, a different Michael, or someone else entirely.

Clarkson walked around the duplex and attempted to look inside, but the windows were covered. The dog inside the duplex followed Clarkson around, barking and growling. When Clarkson reached the sliding door at the back of the duplex, the dog aggressively charged at the sliding door and pushed the blinds out of the way. Clarkson looked through the sliding door and could see overturned furniture, which he interpreted as "signs of [a] struggle" and an indication that "something bad could have happened in there." Clarkson and Adamson agreed to contact animal control in case entry into the duplex was necessary. Adamson believed that he had an obligation to force entry into the duplex to determine whether someone was dead or dying and for the abandoned dog's safety.[4]

Clarkson noticed a man standing across the street who seemed interested in the activities of the police. Clarkson went to talk to the man, who identified himself as Christopher Williamson. Williamson stated that he was a friend of Zomalt and that Zomalt had been staying in the duplex with Michael. Williamson had not seen or heard from Zomalt for several weeks. Clarkson ended his conversation with Williamson at around 7:50 p.m., roughly one hour and ten minutes after the first deputy arrived at the duplex.[5]

Following his conversation with Williamson, Clarkson received a call from Auburn Police Detective Faini. Faini told Clarkson that Auburn police were investigating a possible missing person and homicide case and that it may be

---

[4] An injured or dying person would obviously benefit from assistance. So would a dead person whose body was locked in a duplex unit with a hungry, aggressive carnivore.

[5] This was 33 minutes after Clarkson first arrived at the duplex.

- 6 -

related to Clarkson's welfare check. Faini told Clarkson that the Auburn investigation concerned a roadside carpet burning incident and that he would be interested to know if there was any torn up carpet in the duplex. Faini told Clarkson that the possible victim's name was Zomalt.

Clarkson then contacted Adamson. Clarkson told Adamson that Zomalt was associated by DNA evidence with a roadside burning incident in Auburn. Adamson told Clarkson that he was able to look through the sliding door and see that carpet had been ripped up from the floor.

Adamson and Clarkson did not believe that they had enough time or information to get a search warrant. Clarkson testified,

> A    I don't even know how you would write that, two anonymous tips come in, and torn up carpet. I have no idea what crime, or if any crime we are dealing with, it just doesn't look good. . . .
>
>    . . . .
>
> Q    What is it in your mind that you thought you were dealing with at that point?
>
> A    Dealing with a suspicious welfare check and possibly someone that's down inside, has been hurt or dead, we don't know. So at that point I'm thinking the bottom line is you can't walk away from this. You have got a duty to do something.

With no person apparently able to consent to a police entry of the unit and believing that they did not have a sufficient basis to obtain a search warrant, Adamson and Clarkson made a joint decision to force entry into the duplex. Clarkson broke through the front door. An animal control officer secured the dog. The officers then performed a security sweep of the duplex, looking for anyone who was hurt. Adamson and Clarkson searched the second floor of the duplex while Wiggins and Olivarez searched the first floor. The officers checked all of

the rooms, looking in closets and other large spaces for a person or a body but ignoring drawers and other areas where a person could not fit.

Sergeant Clarkson believed that the smell was coming from inside of the garage and was consistent with a dead body. Once all of the rooms inside the duplex had been checked, deputies Wiggins and Olivarez forced entry into the garage from inside of the duplex. Once inside the garage, all four officers could see a large, rolled up carpet with a shoe sticking out and maggots pouring out of the bottom. Sergeant Clarkson opened the garage door using the automatic door opener and all four officers went around to the outside of the garage for a clear view of the carpet. From outside of the house, the officers saw an arm hanging out of the front end of the carpet. Clarkson told the other officers that "this is a crime scene now," and that "it's time we have to seal this off." None of the officers collected evidence or touched the carpet.

II

Boisselle contends that the trial court erred by denying his motion to suppress the evidence obtained as a result of the warrantless search of the duplex. We disagree.

The United States Constitution prohibits unreasonable searches and seizures. U.S. CONST. amend. IV. "The Fourth Amendment does not prohibit 'reasonable' warrantless searches and seizures. The analysis under the Fourth Amendment focuses on whether the police have acted reasonably under the circumstances." State v. Morse, 156 Wn.2d 1, 9, 123 P.3d 832 (2005). A warrantless search based on an officer's reasonable belief that he or she has the

authority to do so may mean that the search itself is reasonable under the Fourth Amendment. Morse, 156 Wn.2d at 9-10.

Article I, section 7 of the Washington Constitution is more protective than the Fourth Amendment, particularly where warrantless searches are concerned. State v. Smith, 177 Wn.2d 533, 539, 303 P.3d 1047 (2013) (citing Morse, 156 Wn.2d at 9-10). Article I, section 7 provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." "Thus, where the Fourth Amendment precludes only 'unreasonable' searches and seizures without a warrant, article I, section 7 prohibits any disturbance of an individual's private affairs 'without authority of law.'" State v. Valdez, 167 Wn.2d 761, 772, 224 P.3d 751 (2009). "This language not only prohibits unreasonable searches, but also provides no quarter for ones that, in the context of the Fourth Amendment, would be deemed reasonable searches and thus constitutional."[6] Valdez, 167 Wn.2d at 772.

---

[6] It is for this reason that we decline to address Boisselle's contention that the search of his residence was illegal under the Fourth Amendment. The exclusionary rule is a prudential doctrine created by the United States Supreme Court. "Exclusion is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." Davis v. United States, 564 U.S. 229, 236, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011) (quoting Stone v. Powell, 428 U.S. 465, 486, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976)). Rather, the exclusionary rule's purpose is to deter future Fourth Amendment violations. Accordingly, under Fourth Amendment jurisprudence, application of the rule does not follow a warrantless search when, among other instances, the police act with an objectively reasonable good faith belief that their conduct is lawful or when their conduct involves "'isolated'" negligence. Davis, 564 U.S. at 236-39 (quoting Herring v. United States, 555 U.S. 135, 137, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009)).

Although he argues that the warrantless search of his residence was illegal under the Fourth Amendment, Boisselle assumes—without analysis—that the application of the exclusionary rule must necessarily follow. This is not a complete analysis of Fourth Amendment jurisprudence. On this briefing, Boisselle does not present a suitable opportunity for reasoned decision-making. Accordingly, his Fourth Amendment claim does not warrant appellate resolution. See, e.g., State v. Johnson, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992) ("Parties raising constitutional issues must present considered arguments to this court."); RAP 10.3(a)(6).

A search conducted pursuant to a police officer's community caretaking function is one exception to the warrant requirement. State v. Thompson, 151 Wn.2d 793, 802, 92 P.3d 228 (2004). The community caretaking function was first announced by the United States Supreme Court in Cady v. Dombrowski, 413 U.S. 433, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973). In that case, addressing the Fourth Amendment to the United States Constitution, the Court observed that:

> Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

Cady, 413 U.S. at 441.

Our Supreme Court first cited to Cady in State v. Houser, 95 Wn.2d 143, 151, 622 P.2d 1218 (1980), a case involving the impoundment of an automobile. "Subsequent Washington cases have expanded the community caretaking function exception to encompass not only the 'search and seizure' of automobiles, but also situations involving either emergency aid or routine checks on health and safety." State v. Kinzy, 141 Wn.2d 373, 386, 5 P.3d 668 (2000) (footnote omitted).

We review a trial court's decision on a CrR 3.6 motion to suppress to determine whether the court's findings are supported by substantial evidence and whether those findings, in turn, support the conclusions of law. State v. Cole, 122 Wn. App. 319, 322-23, 93 P.3d 209 (2004). Unchallenged findings of fact are verities on appeal. State v. Acrey, 148 Wn.2d 738, 745, 64 P.3d 594 (2003). We review conclusions of law de novo. Cole, 122 Wn. App. at 323. We may

affirm the trial court's ruling on any basis supported by the record and the law. State v. Kelley, 64 Wn. App. 755, 764, 828 P.2d 1106 (1992).

A

We first consider whether the trial court was wrong to deny Boisselle's motion to suppress in light of the framework presented in Smith, 177 Wn.2d 533, the most recent Washington Supreme Court case in which a majority of the court considered the community caretaking function exception to the warrant requirement.

Smith involved a warrantless check of a motel registry and subsequent entry into the room of an overnight guest with an outstanding warrant. 177 Wn.2d at 537. As the police officers were arresting the defendant, they observed an adult female present in the motel room who was badly injured and sobbing. The officers searched the room and discovered that the woman's daughter was also present in the room. The woman told the officers that Smith had beaten her and had sexually assaulted her daughter. Smith, 177 Wn.2d at 537.

A four justice plurality of the Supreme Court concluded that the warrantless search of the motel room fell under the officers' community caretaking function.[7]

> The undisputed facts of this case make it clear that a warrantless, limited intrusion into the motel room was justified by the emergency exception to the warrant requirement, also known as the "save life" exception, a subset of the community caretaking exception to the warrant requirement. Washington courts have held on many occasions that law enforcement may make a warrantless search of a residence if (1) it has a reasonable belief

---

[7] Four other justices concurred in the result but did not discuss or apply the community caretaking function exception to the warrant requirement. Smith, 177 Wn.2d at 550-54.

- 11 -

that assistance is immediately required to protect life or property, (2) the search is not primarily motivated by an intent to arrest and seize evidence, and (3) there is probable cause to associate the emergency with the place to be searched.

Smith, 177 Wn.2d at 541 (citation omitted) (citing Acrey, 148 Wn.2d at 748; State v. Stevenson, 55 Wn. App. 725, 780 P.2d 873 (1989); 12 ROYCE A. FERGUSON, JR., WASHINGTON PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 2734, at 649-51 (3d ed. 2004)).

Justice Chambers dissented, contending that the plurality should have applied the three predicate analysis traditionally employed by the court when considering the community caretaking function exception to the warrant requirement:

"(1) the officer subjectively believed that someone likely needed assistance for health or safety reasons; (2) a reasonable person in the same situation would similarly believe that there was a need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place searched."

Smith, 177 Wn.2d at 557 (Chambers, J. Pro Tem., dissenting) (internal quotation marks omitted) (quoting Kinzy, 141 Wn.2d at 386-87). Justice Chambers stated that, under this analysis, the officers' search failed on the first predicate because the officers did not have a subjective belief that someone needed assistance when they reviewed the motel registry and knocked on the defendant's door. Smith, 177 Wn.2d at 557 (Chambers, J. Pro Tem., dissenting).

Because, in Smith, a controlling majority of justices considered the application of the community caretaking function exception to the warrant requirement, that decision provides the appropriate framework for our resolution of this matter. We conclude that the circumstances herein satisfy each of the

three predicate formulations considered by either the plurality or the dissent in Smith. See 177 Wn.2d at 541 (plurality opinion); Smith, 177 Wn.2d at 557 (Chambers, J. Pro Tem., dissenting).

The trial court entered several pertinent findings that are not challenged on appeal. The trial court found that Wiggins "thought there 'potentially' was a body inside the duplex." The trial court found that neighbors told Olivarez that "nobody had been seen at the home in 'about a week,' and the dog had not been outside during that time." The trial court found that Clarkson "believed from the information provided by the anonymous caller that someone inside the duplex was 'possibly shot or dead.'" The trial court found that "[n]one of the information the deputies gathered prior to their entry confirmed the defendant or Mr. Zomalt was alive or safe. The information heightened the deputies' concern over the welfare of those two men." The trial court found that all four of the officers "believed, both subjectively and collectively, that it was their duty to public safety and welfare, and part of their community caretaking function, to enter the duplex without a warrant." These findings, which are verities on appeal, support the conclusion that the officers subjectively and reasonably believed that assistance may have been immediately required to protect one or more individuals inside the duplex.

Several of the trial court's findings also support the conclusion that the officers were not primarily motivated by an intent to search for or seize evidence.[8]

_____

[8] Boisselle does not challenge the trial court's conclusion that the "entry into the duplex was not a pretext for conducting an evidentiary search, or a pretext for investigating a crime."

The trial court found that the Auburn police put out a bulletin looking for Zomalt. "That bulletin was provided only to fellow law enforcement agencies, captioned 'Suspicious Circumstances – attempt to locate.'" However, the trial court also noted that there was no evidence that the deputies had seen the bulletin. The trial court found that "[n]one of the deputies intended to advance a criminal case investigation that had been started by Auburn PD. None of the deputies intended to conduct a criminal investigation inside the duplex."[9] The testimony makes clear that the officers did not know whether Zomalt was alive or dead, whether "Mike" was alive or dead, what crime—if any—might have been committed, or which individual might have committed a crime. The officers' search of the duplex was not a pretext for a criminal investigation. Accordingly, the trial court's findings satisfy each of the three predicate formulations applied by the five justices in Smith. See 177 Wn.2d at 541 (plurality opinion); Smith, 177 Wn.2d at 557 (Chambers, J. Pro Tem., dissenting).

Nevertheless, Boisselle contends that the officers could not have reasonably believed that assistance was immediately required to resolve an

---

[9] Boisselle contends that this finding is not supported by substantial evidence. We disagree. Adamson and Clarkson testified that they believed that there was at least one possibly dead or dying person inside the duplex. Olivarez testified that he was not at the duplex to perform a criminal investigation but, rather, "to figure out if someone need[ed] help." Once inside the duplex, the officers performed a security sweep and checked each room for anyone in need of assistance. The officers did not look in drawers, cabinets, or any other location where a person could not be. Once the officers discovered the dead body and realized that there was no one else inside the duplex, they secured the duplex and exited to wait for a warrant.

Although Clarkson and Adamson learned that their welfare check may be related to a criminal investigation in Auburn concerning Zomalt, they did not know if Zomalt was inside the duplex or, if he was, whether he was seriously injured or dead. Clarkson and Adamson did not know if there were any other people inside the duplex who were injured or dead. Clarkson and Adamson could not articulate any specific crime that was suspected of being committed and they were concerned that there may be someone inside the duplex in need of immediate assistance. The trial court's findings are supported by substantial evidence.

- 14 -

emergency. This is so, he asserts, because the officers did not know what they had[10] and because they waited an inordinate amount of time between arriving at the duplex and entering to check on the health and safety of the occupants.

We are unpersuaded by Boisselle's contention that the officers did not act quickly enough to justify the intrusion under the community caretaking function exception. What constitutes an "emergency" and what steps are necessary to render immediate assistance is highly dependent on the circumstances. Indeed, an officer may reasonably believe that assistance is necessary even though the officer cannot see or hear an individual in need of help. We have previously held that an officer who could not ascertain the health or safety of an individual and suspected that the individual might be dead was nevertheless properly acting pursuant to his community caretaking function by entering the individual's residence. State v. Gocken, 71 Wn. App. 267, 276, 857 P.2d 1074 (1993) ("So long as it is undertaken in good faith and is not motivated by an intent to arrest or search for evidence of a crime, a warrantless search conducted in order to check on an individual's health or safety is a valid exception to constitutional warrant requirements."). Boisselle cites to no authority that places a time clock on an officer's decision concerning whether to render assistance pursuant to the community caretaking function.

In any event, the record establishes that the officers acted promptly given the circumstances. From the moment they arrived at the duplex, until entry, the

---

[10] Boisselle relies on the trial court's finding that "[t]here was nothing [that the officers] saw or heard that allowed them to determine [if] a person was alive inside the duplex, in need of immediate help."

- 15 -

officers individually and collectively began to ascertain the situation at hand. This included checking doors and windows to determine whether anyone was inside the duplex, contacting both the owner of the duplex and the individual listed on the lease in attempts to obtain consent to enter, questioning neighbors, and contacting animal control.[11] Ultimately, the officers reached a point where two things were clear: (1) obtaining consent to enter was not possible as no person entitled to consent could be identified, and (2) there was nothing further the officers could do to discern the welfare of any person inside the unit absent entry. At this point, the officers reasonably concluded that forcible entry was necessary to determine the need for and to render assistance. Given the circumstances, this was an immediate response to a likely emergency.

The officers' warrantless search of the duplex was justified pursuant to the community caretaking function exception as considered by a majority of the Supreme Court in Smith. See 177 Wn.2d at 541 (plurality opinion); Smith, 177 Wn.2d at 557 (Chambers, J. Pro Tem., dissenting). Accordingly, the trial court did not err by denying Boisselle's motion to suppress.

B

The trial court was also not wrong to deny Boisselle's motion to suppress pursuant to the balancing approach discussed by our Supreme Court in Kinzy, 141 Wn.2d 373.

---

[11] The presence of an aggressive dog inside the duplex precluded the officers from safely entering until animal control arrived.

In that decision, the Supreme Court held that the community caretaking function exception to the warrant requirement applies when

"(1) the officer subjectively believed that someone likely needed assistance for health or safety reasons; (2) a reasonable person in the same situation would similarly believe that there was a need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place searched."[12]

Kinzy, 141 Wn.2d at 386-87 (quoting State v. Menz, 75 Wn. App. 351, 354, 880 P.2d 48 (1994)).

"Under a routine check on safety, '[w]hether an encounter made for noncriminal, noninvestigatory purposes is reasonable depends on a balancing of the individual's interest in freedom from police interference against the public's interest in having the police perform a "community caretaking function."'" Kinzy, 141 Wn.2d at 387 (alteration in original) (quoting Kalmas v. Wagner, 133 Wn.2d 210, 216-17, 943 P.2d 1369 (1997) (quoting State v. Mennegar, 114 Wn.2d 304, 313, 787 P.2d 1347 (1990))). "[R]endering aid or assistance through a health and safety check is a hallmark of the community caretaking function exception. Otherwise a police 'officer could be considered derelict by *not* acting promptly to ascertain if someone needed help.'" Kinzy, 141 Wn.2d at 389 (quoting Gocken, 71 Wn. App. at 276).

---

[12] The court in Kinzy also characterized the community caretaking function as being "totally divorced from a criminal investigation." 141 Wn.2d at 385 (citing Cady, 413 U.S. at 441). We note, however, that more recent cases have more aptly described the caretaking function as being one that is not a pretext for a criminal investigation. See Smith, 177 Wn.2d at 541 ("the search is not primarily motivated by an intent to arrest and seize evidence"); see also State v. Schultz, 170 Wn.2d 746, 754, 248 P.3d 484 (2011) ("the claimed emergency is not a mere pretext for an evidentiary search").

Kinzy involved two officers who observed a young girl, whom they believed to be between 11 and 13 years old, walking in a high narcotics trafficking area in downtown Seattle with a group of older people. The officers recognized one of the adult males walking with the girl as someone who was associated with narcotics. Concerned for the girl's safety, the officers approached the group and began to question the girl. The girl refused to respond to the officers and attempted to walk away. During this interaction, the officers noticed a white substance on the girl's coat that they believed to be cocaine. The officers prevented the girl from leaving, field tested the substance, and, after confirming that it was cocaine, arrested the girl. Kinzy, 141 Wn.2d at 378-81.

Balancing the young girl's individual interest in freedom from police interference against the public interest in having the police ensure the safety of at-risk youths, the court concluded that the preseizure encounter was reasonable and justified as a part of the officers' community caretaking function.

> In this case, the first event at 10:10 p.m. was the starting point of a preseizure encounter, albeit a brief one. Officers Jennings and Kim observed Petitioner, decided to approach her and then hailed her. Their decision, based on good intentions, was supported by (1) their perception and erroneous belief that Petitioner was between the ages of 11 and 13; (2) the late hour of 10:10 p.m. on Tuesday, March 3, 1998; (3) her presence in a high narcotics trafficking area on the corner of Third Avenue and Stewart Street in downtown Seattle; and (4) the fact she was in the company of several persons, including one adult male person known by the officers to be associated with narcotics.
>
> The officers testified the encounter was initiated by their concern for Petitioner's safety as a potential youth at risk. The public interest without question comports with increasing the safety of children, especially those considered "at-risk youth."

> . . . Balancing the interests indicates the preseizure encounter was reasonable and justified under the community caretaking function exception.

Kinzy, 141 Wn.2d at 388-89 (footnote omitted) (quoting RCW 13.32A.010).

Here, applying the Kinzy balancing approach, we reach the same result. As discussed herein, all four of the officers subjectively believed that there was possibly someone inside the duplex who was injured or dead. The officers were not able to discern the welfare of Zomalt or "Mike" and, based on the information provided to them and the state of the duplex upon their arrival, believed that they had a duty to enter and render aid. The officers were also aware of the presence of an aggressive and likely starving dog inside the unit, heightening the need for police intervention.

There is a significant public interest in having police officers render assistance to seriously injured or dying persons. "Indeed, this court has previously observed that when 'an officer believes in good faith that someone's health or safety may be endangered . . . public policy does not demand that the officer delay any attempt to determine if assistance is needed and offer assistance while a warrant is obtained.'" State v. Moore, 129 Wn. App. 870, 880-81, 120 P.3d 635 (2005) (alteration in original) (quoting Gocken, 71 Wn. App. at 276). This interest is so strong that a police officer who believes that someone may be in danger "could be considered derelict by *not* acting promptly to ascertain if someone needed help." Gocken, 71 Wn. App. at 276.

Similarly, there is a significant public interest in protecting human dignity by, in this case, removing a dead body from a residence where a starving and

carnivorous animal is present.[13] We are unwilling to conclude that an individual's interest in being free from police intrusion outweighs the public's interest (or that person's interest) in having the police remove a dead body before it is consumed by a starving animal.

The officers' belief that someone likely needed assistance was reasonable under these circumstances. Accordingly, the trial court did not err by denying Boisselle's motion to suppress.

III

Boisselle next contends that the trial court erred by refusing to instruct the jury concerning justifiable homicide in resistance of a felony. Boisselle asserts that the trial court's failure to give his proposed instruction deprived him of a meaningful opportunity to present a complete defense. We disagree.

"Where a trial court has refused to give a justifiable homicide or self-defense instruction, the standard of review depends upon why the trial court did so." State v. Brightman, 155 Wn.2d 506, 519, 122 P.3d 150 (2005) (citing State v. Walker, 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998)).

> If the trial court refused to give a self-defense instruction because it found no evidence supporting the defendant's subjective belief of imminent danger of great bodily harm, an issue of fact, the standard of review is abuse of discretion. If the trial court refused to give a

---

[13] Our legislature has repeatedly recognized the importance of protecting human dignity after death. In 1985, the legislature enacted a statute criminalizing the practice of cremating more than one human remains at a time. RCW 68.50.185. The legislature was concerned "that certain practices in storing human remains and in performing cremations violate common notions of decency and generally held expectations," and sought to reaffirm "that certain practices, which have never been acceptable, violate principles of human dignity." RCW 68.50.185, Legislative finding 1985 ch. 402 § 1. Numerous other statutes have been enacted with the same principles in mind. See RCW 68.50.160 (providing that a person has the right to control the disposition of his or her own remains without the consent of another person); RCW 9A.44.105 (criminalizing sexual intercourse with a dead human body); RCW 68.50.130 (prohibiting the unlawful disposal of human remains).

self-defense instruction because it found no reasonable person in the defendant's shoes would have acted as the defendant acted, an issue of law, the standard of review is de novo.

State v. Read, 147 Wn.2d 238, 243, 53 P.3d 26 (2002) (citing Walker, 136 Wn.2d at 771-72).

Here, the trial court engaged both parties in a colloquy about jury instructions at the outset of the trial. The trial court did not require the defense to file a complete set of proposed jury instructions, but did order the defense to propose any instructions that it was seeking that were different from the State's proposed instructions. The State filed its proposed instructions on April 28, 2016. Boisselle filed his proposed instructions on May 9, 2016.

Boisselle's proposed instructions included two Washington pattern jury instructions, 11 Washington Practice: Washington Pattern Jury Instructions: Criminal 16.02 and 16.03 (3rd ed. 2008) (WPIC), addressing justifiable homicide. The first concerned justifiable homicide in defense of self and read, in part:

> Homicide is justifiable when committed in the lawful defense of a defendant when:
> 1) a defendant reasonably believed that the person slain intended to commit a felony or to inflict death or great personal injury;
> 2) a defendant reasonably believed that there was imminent danger of such harm being accomplished; and
> 3) a defendant employed such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the defendant, taking into consideration all the facts and circumstances as they appeared to him, at the time of and prior to the incident.

The second concerned justifiable homicide in resistance to a felony. That instruction read, in part:

> Homicide is justifiable when committed in the actual resistance of an attempt to commit a felony upon a defendant.

A defendant may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the defendant, taking into consideration all the facts and circumstances as they appeared to him at the time and prior to the incident.

Boisselle did not propose any instructions defining any felony offense.

On May 18, 2016, after both parties rested their cases, the trial court excused the jury with orders to return the following day for closing arguments. As the court recessed, defense counsel stated that he had additional instructions that he would be proposing. Defense counsel provided those instructions to the State and to the court via e-mail at 4:19 p.m. that evening. The e-mail listed 18 additional instructions by WPIC number only. The following morning, at the hearing to discuss the instructions, defense counsel brought a packet of proposed instructions that included definitions of the felony offenses of burglary, kidnapping, unlawful imprisonment, and felony harassment.

The trial court refused to instruct the jury on Boisselle's theory of justified homicide in resistance to a felony. The trial court issued an order in which it made detailed findings concerning the proposed instruction. The trial court found:

> [E]verything put forward by the defense suggested to the State that the defense in this case was based on the theory of self-defense involving defense of the person, or defending a physical attack on the defendant. That information included the general language in the omnibus order, the initial packet of instructions proposed by the defense, opening statement given by defense counsel, cross-examination of the State's witnesses, and the direct of the defendant. All of that evidence suggested the defendant was personally fending off a physical attack at the time of this shooting. During his entire direct examination, the defendant never suggested that he shot the victim for any reason other than to prevent a direct personal attack on the defendant's person. The

State's cross-examination of the defendant was clearly focused on the issue of the defendant's use of force to defend his person from an attack by the victim. In point of fact, the first time the Court realized the defense was putting forth a different theory was when the court looked at the subject matter of the WPICs listed in defense counsel's e-mail after the close of evidence.

The trial court further found that the evidence presented at trial did not properly put at issue Boisselle's alternative theory. The trial court found that "[t]here was no evidence presented by the defense that suggest the defendant's act of shooting the victim was, *at the time of the shooting*, done in resistance to the commission of a felony." The trial court found that the State "only had notice of the theory of self-defense that is defense of the person, and the evidence actually presented by the defense establish only that theory and no other."

Finally, the trial court found that Boisselle would not be prejudiced by the court's refusal to give the proposed instruction. The trial court noted that "[d]efense of self and defense in resistance to a felony are closely related, as every person who defends being attacked is resisting the commission of a felony assault." Accordingly, the trial court found that Boisselle would "still be allowed to argue his theory of the case, which is the theory supported by the actual evidence presented at trial, which is the defendant was defending himself against a personal attack by the victim."[14]

---

[14] The jury was ultimately instructed on justifiable homicide in defense of self:
    Homicide is justifiable when committed in the lawful defense of the defendant when:
    1) the defendant reasonably believed that the person slain intended to inflict death or great personal injury;
    2) the defendant reasonably believed that there was imminent danger of such harm being accomplished; and
    3) the defendant employed such force and means as a reasonably prudent person would use under the same or similar conditions as they

- 23 -

The trial court found that there was no evidence adduced at trial to support the defense of justifiable homicide in resistance of a felony. Rather, all of the evidence, viewed in the light most favorable to Boisselle, indicated that Boisselle was defending himself against death or great personal injury. Accordingly, the trial court refused to give the proposed instruction. This was not an abuse of the court's discretion.

Moreover, although he asserts that the trial court erred by refusing to issue his proposed instruction, Boisselle does not attempt to analyze whether a justifiable homicide defense applies in the context of the felonies that he suggests that he was defending against. We have previously held that such a defense "applies only if the felony which was sought to be prevented threatens life or great bodily harm." State v. Brenner, 53 Wn. App. 367, 376, 768 P.2d 509 (1989) (concluding that the trial court did not err by refusing the defendant's proposed instruction on justifiable homicide in resistance of a felony because the court's self-defense instruction allowed the defendant to argue his theory of the case), overruled on other grounds by State v. Wentz, 149 Wn.2d 342, 68 P.3d 282 (2003). Because Boisselle was already arguing that he was resisting death or great bodily harm when he killed Zomalt, his proposed instruction would have been repetitious. See State v. Heath, 35 Wn. App. 269, 273, 666 P.2d 922 (1983) (concluding that the defendant's proposed self-defense instructions were repetitious of the instruction already given to the jury).

---

reasonably appeared to the defendant, taking into consideration all the facts and circumstances as they appeared to him, at the time of and prior to the incident.

There was no error.

IV

Boisselle next contends that the prosecutor committed flagrant misconduct during rebuttal argument, thus depriving him of a fair trial. This is so, he asserts, because the prosecutor misstated the law concerning self-defense. We disagree.

To prevail on a claim of prosecutorial misconduct, the defendant must show that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial. State v. Miles, 139 Wn. App. 879, 885, 162 P.3d 1169 (2007). A prosecutor commits misconduct by misstating the law in closing argument. State v. Warren, 165 Wn.2d 17, 28, 195 P.3d 940 (2008). However, a prosecutor has "wide latitude to argue reasonable inferences from the evidence." In re Personal Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). "[T]he prosecuting attorney is entitled to make a fair response to the arguments of defense counsel." State v. Brown, 132 Wn.2d 529, 566, 940 P.2d 546 (1997). In this regard, "[i]t is not misconduct for a prosecutor to argue that the evidence does not support the defense theory." State v. Graham, 59 Wn. App. 418, 429, 798 P.2d 314 (1990).

Here, Boisselle testified at trial that he was roughly five feet away from Zomalt when he began to fire. For its part, the State presented expert testimony that Zomalt was shot three times in the head and that each shot was a contact wound caused by a gun touching his head.

During closing argument, Boisselle's attorney argued that Boisselle shot Zomalt in defense of his own life, after Zomalt stood up from the couch and began to chase after Boisselle.

> [Boisselle] went, he grabbed the gun off of the arm of the love seat. He ran, trying to get away, he was going to go up the stairs. At that moment when he takes the gun, Mr. Zomalt gets up out of that couch . . . . So he gets up off this love seat, starts coming after Mr. Boisselle. Mr. Boisselle turns and fires the gun.
>  . . . .
> So he picks up the gun, turns and just fires, and his intent at that moment is fear induced, because Mr. Zomalt is chasing after him in his own house. . . . Mr. Zomalt got up out of that chair, started coming after him, and as I said, Mr. Zomalt put the fear of God in Mr. Boisselle and—in a split second, ladies and gentlemen, you can see the distance that we are talking about—in a split second he had to react, and what he did was he started firing.

In rebuttal argument, the prosecutor addressed the defense theory:

> The law does allow you to defend yourself against an attack with reasonable force. If you are about to get beat down with fists, you can respond with fists. If you are about to get shot with a gun, you can shoot a gun. There is a big difference between defending yourself with reasonable force and defending yourself with deadly force. This defendant went to the end first. His reaction to what he says was a threat was to fire multiple gunshots, including three to the head. Keep in mind, it's only possible if you reject Dr. Lacy's testimony that these are contact wounds . . . .
>  . . . .
> So now let's talk about the actual law of self-defense. Instruction No. 26 says, necessary means under the circumstances as they reasonably appear to the actor, no reasonably effective alternative appeared to exist and the amount of force used was reasonable to effect the purpose. You can respond in kind.
> Mr. Boisselle said I was going to get beat up. So he can beat him back up or fight back. And you know what? If a fistfight ensues and Mr. Zomalt is winning and inflicting a severe beating or death on Michael Boisselle, then he can fire shots. *There's no preemptive strike in self-defense.*

(Emphasis added.) Boisselle then interposed an objection on the basis that the prosecutor had misstated the law. The objection was overruled.

The prosecutor continued:

There is no preemptive strike. And when you read your instructions and it talks about standing your ground in your own home, no duty to retreat, all that stuff is true, right, but it's all filtered through reasonably necessary. It doesn't matter if Mr. Zomalt was told to leave and didn't, you can't shoot him down. It doesn't matter if Mr. Boisselle hours earlier put a gun in your face, you can't take the gun and shoot him down. There has to be a threat of great personal injury, severe pain and injury or death before you can use deadly force, which is what this defendant did. He used deadly force. And he told you from the witness stand, I pointed at him and I fired and fired and fired and fired and fired until he dropped.

The prosecutor then addressed the justifiable homicide jury instruction:

Instruction No. 22 that sets out self-defense uses the word "reasonably" four separate times. Four. And that's because the law of self-defense is based on necessity. You can respond in kind. And if you don't respond in kind, you are going to be held accountable. Are you allowed to make a mistake? Sure. Actual danger isn't necessary, as long as you reasonably perceived the danger. And see, here's how the law of self-defense works: There is a subjective standard. There is an objective standard. The subjective standard is this: Did Michael Boisselle, himself, believe that he had to defend himself against Brandon Zomalt with deadly force? Did he believe it? That's the first question for you folks to ask. Did Michael Boisselle believe in it? Not just did he believe it. Did he reasonably believe it, based on everything he knew? . . . Defendant said he had to do it, but was that conclusion by him reasonable?

The second one is an objective standard and the difference between the two is this . . . . You 12 will determine objectively whether or not what he said was reasonable. Would a reasonable person do what Michael Boisselle did if that reasonable person knew everything Michael Boisselle knew? . . .

A couple of final things. Even if all of that is true, the response, the deadly force that's used, is no more than necessary to accomplish the act. And so if Brandon Zomalt is a threat of great personal injury, and charged Michael Boisselle and all that is true, and the defendant's fear is reasonable he can shoot him twice, and then he stops, because then he stopped the threat. *He doesn't get to fire five. He doesn't get to fire three in his head. And when you over self-defend, you assault.* And when you assault and cause death, you commit Felony Murder Two.

- 27 -

> If everything he says is true, then he's a murderer, because he can't use the amount—the nature of the force, deadly, and the amount of the force, five gunshots.

(Emphasis added.) At this point, Boisselle interposed an objection, again arguing that the prosecutor was misstating the law. The objection was overruled. The prosecutor continued:

> *You can't over defend.* You don't get to put three in the brain because you're angry that the guy came at you. You can't. And even if the defendant can put three shots in Brandon, one in the back of his head from a distance of five to six feet, he doesn't get to finish him off. That's an assault. That's felony murder.

(Emphasis added.)

On appeal, Boisselle contends that the prosecutor's "preemptive strike" and "over defend" arguments were misstatements of the law. Boisselle asserts that, to establish a claim of self-defense, he "need only show reasonable apprehension of great bodily harm and imminent danger to himself or to another," and that he "need not show actual danger." Br. of Appellant at 74. Boisselle also asserts that the prosecutor's argument likely caused the jurors to discredit his claim of self-defense based solely on the number of shots fired. Br. of Appellant at 75.

The prosecutor's statements, considered in light of the entire argument, were not misstatements of the law. Boisselle argued to the jury that the amount of force that he used was reasonably necessary to protect himself under the circumstances as he understood them. Responding to that argument, the prosecutor argued to the jury that the amount of force that Boisselle used was *more than that which was reasonably necessary* under the circumstances.

Rather than shooting Zomalt to protect himself from imminent danger of great bodily harm or death, the prosecutor argued, Boisselle either preemptively killed Zomalt by inflicting three contact wounds to his head or incapacitated Zomalt and continued to shoot him until he died. Contrary to Boisselle's assertions on appeal, the prosecutor never told the jury that Boisselle needed to be in "actual danger" in order to establish self-defense. To the contrary, the prosecutor explicitly argued to the jury, "Are you allowed to make a mistake? Sure. Actual danger isn't necessary, as long as you reasonably perceived the danger." There was no misconduct.

Affirmed.

We concur:

Trickey, ACJ

SPEARMAN J. (Concurring) – I agree with the majority that the deputies' entry into Boiselle's residence passes constitutional muster under article 1, section 7 of the Washington State constitution but for different reasons. In State v. Smith, 177 Wn.2d 533, 303 P.3d 1047 (2013), a plurality of the court agreed that law enforcement's community caretaking function is a valid exception to our State constitution's warrant requirement. The lead opinion also identified the emergency aid exception to the warrant requirement as one subset of the community caretaking function. Smith, 177 Wn.2d at 541. Community caretaking, however, is not limited to emergency aid.[1] I disagree with the majority's effort to shoehorn the facts of this case into the emergency aid exception to our State constitution's warrant requirement. Instead, I would hold that the entry in this case is valid as an exercise of law enforcement's community caretaking function.

As the majority notes, the applicability of the emergency aid exception, as set out in Smith is determined by a three part test: (1) that the law enforcement officer has a reasonable belief that assistance is immediately required to protect life or property; (2) the search is not primarily motivated by an intent to arrest and seize evidence; and (3)

---

[1] This court has noted that:

> police officers acting in their community caretaking function occasionally perform services in addition to enforcement of the penal laws. State v. Lynch, 84 Wn. App. 467, 477, 929 P.2d 460 (1996). Many citizens look to the police to assist them in a variety of circumstances, including delivering emergency messages, giving directions, searching for lost children, assisting stranded motorists, and rendering first aid. State v. Chisholm, 39 Wn. App. 864, 867 n.3, 696 P.2d 41 (1985). Thus, actions which fall into the community caretaking function are indeed a fundamental purpose of government.

Hudson v. City of Wenatchee, 94 Wn. App. 990, 996, 974 P.2d 342 (1999).

1

there is probable cause to associate the <u>emergency</u> with the place to be searched. <u>Id.</u> It is plain that in this case there was not an emergency and that the deputies did not believe that immediate assistance was necessary to protect a life. The trial court's unchallenged findings were that:

> ... the four deputies were not able to confirm an immediate emergency existed. There was nothing they saw or heard that allowed them to determine a person was alive inside the duplex in need of immediate help. The deputies did not call for emergency aid to stand by, and the deputies did not decide to enter the duplex for approximately 1.5 hours after the first deputy arrived.

Clerk's Papers (CP) at 358. Yet, the majority insists the trial judge got it wrong and concludes there was an emergency and the officers really did believe immediate assistance was necessary to save a life.

Perhaps the majority strains so hard to fit these square facts into the round hole of the emergency aid exception because the contours of the community caretaking function, at least as applied under article 1, section 7 of our State constitution, have not been clearly delineated by our Supreme Court. As the majority appears to see it, the lead opinion and the dissent in <u>Smith</u> articulated different three part tests to determine whether the community caretaking exception applies. Justice Chambers' test differs primarily in that the first factor did not require a need for immediate action and the third factor did not require an emergency.[2] In the apparent belief that the two tests are mutually exclusive, the majority attempts to accommodate both to the facts of this case,

---

[2] And, although the second factor also differed because it focused on whether the officers' belief in the need for assistance was objectively reasonable, instead of whether the search was motivated by an intent to arrest and seize evidence, Justice Chambers was clear that the community caretaking function only applies when the search is divorced from any criminal investigation. <u>Smith</u>, 177 Wn.2d at 556-57.

2

and in so doing, stretches the meaning of "immediate" and "emergency" beyond recognition. The effort is unnecessary and unsuccessful.

The better approach is to recognize that the lead opinion in Smith does exactly what it says it is doing: establishes a test that specifically applies to "the emergency exception to the warrant requirement, also known as the 'save life' exception, a subset of the community caretaking exception to the warrant requirement." Smith, at 541 (citing State v. Acrey, 148 Wn.2d 738, 748, 64 P.3d 594 (2003)). In contrast, Justice Chambers articulated a test that, in his view, applies to the community caretaking exception generally, including the emergency aid exception. This can be easily seen when his articulation of the test is viewed in context. He wrote:

> One such exception to the warrant requirement is the community caretaking function. This court has never specifically considered the allowable contours of the community caretaking exception under article I, section 7. However, as we stressed in State v. Kinzy, 141 Wn.2d 373, 385, 5 P.3d 668 (2000), this exception arises from the exercise of "'[l]ocal police officers ['] ... *community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.*'" Id. (quoting Cady v. Dombrowski, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973)). Over the years, "Washington cases have expanded the community caretaking function exception to encompass not only the 'search and seizure' of automobiles, but also situations involving either emergency aid or routine checks on health and safety." Id. at 386, (footnote omitted) (citing State v. Loewen, 97 Wn.2d 562, 567-68, 647 P.2d 489 (1982); State v. Villarreal, 97 Wn. App. 636, 643-44, 984 P.2d 1064 (1999)). It may be that article I, section 7 could tolerate an extension of the emergency aid exception that would encompass the search here. However, I cannot agree with the lead opinion that, as currently articulated, the exception applies here. The emergency aid exception
>
>> applies when "(1) the officer subjectively believed that someone likely needed assistance for health or safety reasons; (2) a reasonable person in the same situation would similarly believe that there was a need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place searched."

Id. at 386-87 (quoting State v. Menz, 75 Wn. App. 351, 354, 880 P.2d 48 (1994)).

Smith at 556-57. (Emphasis added.) It is apparent that according to Justice Chambers, whether the issue involves an emergency or a routine check on health and safety, the same test should be applied.

In this case, the trial court's unchallenged findings that there was neither an emergency nor a need for immediate action are verities on appeal and we are bound by them. Because there was no emergency, the disagreement between the lead opinion and the dissent in Smith on the parameters of the emergency aid exception is immaterial to this case. The emergency aid exception as articulated by the lead opinion in Smith is simply not applicable here. We may not ignore the meaning of words or violate our own rules to make the emergency aid exception fit where it does not.

In Smith, a plurality of the Supreme Court concluded that, under proper circumstances, law enforcement's exercise of its community caretaking function may be a valid exception to the warrant requirement under article 1, section 7. While the lead opinion does not expressly address the parameters of the exception, the test, as set out by Justice Chambers in his dissent, has been previously articulated in numerous cases, albeit primarily in addressing searches or seizures under the Fourth Amendment to the U. S. Constitution. See State v. Thompson, 151 Wn.2d 793, 802, 92 P.3d 228 (2004); State v. Acrey, 148 Wn.2d 738, 748, 64 P.3d 594 (2003); Kinzy, 141 Wn.2d at 386. Kalmas v. Wagner, 133 Wn.2d 210, 216-17, 943 P.2d 1369 (1997)).

Where Washington courts have analyzed the community caretaker exception under article I, section 7, they have applied the same test. In State v. Gocken, for

4

example, we noted that "police may be required to perform a warrantless search, not as a response to an immediate emergency, but as part of their function of protecting and assisting the public." State v. Gocken, 71 Wn. App. 267, 276, 857 P.2d 1074 (1993). The Gocken court held that, "[s]o long as it is undertaken in good faith and is not motivated by an intent to arrest or search for evidence of a crime, a warrantless search conducted in order to check on an individual's health or safety is a valid exception to constitutional warrant requirements." Id. at 277 (citing Cady, 413 U.S. at 447-48). Regardless of whether an emergency was involved, the State can demonstrate that the search was a valid exercise of community caretaking "by proving that: (1) the officer subjectively believed that someone likely needed assistance for health or safety reasons; (2) a reasonable person in the same situation would similarly believe that there was a need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place searched." Id. See also State v. Gibson, 104 Wn. App. 792, 796-97, 17 P.3d 635 (2001); State v. Angelos, 86 Wn. App. 253, 255-57, 936 P.2d 52 (1997); Menz, 75 Wn. App. at 353-54.

In this case, the circumstances indicated that "there 'potentially' was a dead body inside the duplex." CP at 355. An agitated dog was locked inside. No one had entered or left the house in several days. These circumstances did not lead police to believe that someone inside required their immediate assistance. But neither could police officers walk away, potentially leaving a starving dog locked in a house with a dead body.

The trial court applied the proper test and found that the search was divorced from any criminal investigation, the deputies' belief that there was a need for assistance was objectively reasonable, and there was a reasonable basis to associate the need for

assistance with the place searched. These findings are supported by substantial evidence. Accordingly, while I disagree with the majority's reliance on the emergency aid exception, I would affirm the trial court on the ground that the search was a valid exercise of law enforcement's community caretaking function.

Spearman, J.